209 P.3d 479 (2009)
STATE of Washington, Respondent,
v.
Duane Jonathon KOSLOWSKI, Petitioner.
No. 80427-3.
Supreme Court of Washington, En Banc.
Argued September 16, 2008.
Decided June 18, 2009.
*481 Stephanie C. Cunningham, Attorney at Law, Seattle, WA, for Petitioner.
Kenneth L. Ramm Jr., Yakima County Prosecuting Attorney, Criminal Division, Yakima, WA, for Respondent.
MADSEN, J.
¶ 1 Petitioner Duane Koslowski maintains that his right to confrontation was violated when police officers testified about statements made to them by the victim of his charged offenses when the officers responded to a 911 call. The victim died before trial and was unavailable to testify. The question is whether the victim's statements to the officers were testimonial and, if so, whether their admission at trial was harmless error. We hold that the statements were testimonial and their admission at trial was not harmless. Accordingly, we reverse the Court of Appeals.

FACTS
¶ 2 Mr. Koslowski was charged with seven crimes involving two home invasion robberies. At this stage of the proceedings, convictions for three offenses committed on November 13, 2002, are at issue. Ms. Violet Alvarez, the victim, died before trial. The State therefore sought to introduce statements she made as excited utterances and thus satisfy confrontation clause concerns under then applicable precedent, Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). The trial court granted the State's motion and the statements were admitted at Koslowski's trial.
¶ 3 On appeal, Mr. Koslowski argued that under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which overruled Roberts, admission of Ms. Alvarez's statements violated his confrontation clause rights because the statements were testimonial. In Crawford, the United States Supreme Court held that the confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53-54, 124 S.Ct. 1354. The Court of Appeals rejected Koslowski's argument and affirmed his convictions in an unpublished opinion but reversed the exceptional sentence that had been imposed because a judge, not a jury, had found the aggravating factors justifying the exceptional sentence. State v. Koslowski, noted at 130 Wash.App. 1005, 2005 WL 3753136 (Koslowski I), review granted and cause remanded, 157 Wash.2d 1012, 138 P.3d 113 (2006).
¶ 4 Mr. Koslowski petitioned for review. While his petition was pending in this court, the Court issued its decision in Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), which addressed the meaning of "testimonial statement." We remanded Koslowski's case to the Court of Appeals for reconsideration in light of Davis.[1] In an unpublished opinion, the *482 Court of Appeals again affirmed the convictions for the crimes involving Ms. Alvarez, reasoning that her statements introduced at trial by the State were not testimonial under Davis and, even if they were testimonial, any error was harmless. State v. Koslowski, noted at 139 Wash.App. 1014, 2007 WL 1719930 (Koslowski II), review granted, 163 Wash.2d 1012, 180 P.3d 1291 (2008). Koslowski again petitioned for review, claiming that Ms. Alvarez's statements were testimonial and therefore inadmissible. We granted his petition.
¶ 5 The evidence submitted at Mr. Koslowski's trial and at the pretrial hearing addressing the State's motion to admit Ms. Alvarez's statements established that on November 13, 2002, Yakima Police Officers Nolan Wentz and Michael Kryger responded to a 911 call reporting the robbery. Sergeant Wentz testified that he arrived about 5:50 p.m., approximately two minutes after he was called to respond. He went to the front door, from which he could see Ms. Alvarez on the telephone with the 911 operator. She ended the call and opened the door for him. He testified that she was looking all around and was extremely emotional and very upset. Wentz testified that Ms. Alvarez started telling him what was going on right away and directed him inside, where there was a couch to the left and some white wire ties on the floor, like those used by police as temporary handcuffs. Ms. Alvarez told him the ties were used on her and she showed him where she had been forced to lie on the floor. Sergeant Wentz testified that he asked more questions about what happened and she responded. He said these questions did not take very long because he "was trying to get as much information as [he] could to give to the other officers in the field." 1 Verbatim Report of Proceedings at 113 (Jan. 13, 2003). The record does not show what questions were asked and how Ms. Alvarez answered, nor does it give the context and timing in more than general terms.
¶ 6 Officer Kryger testified that it took him about six or seven minutes to respond and he was the second officer on the scene. He also testified that Ms. Alvarez was very frightened. After Kryger arrived, Officer Wentz had her begin again her explanation of what had happened. The officers testified that Ms. Alvarez explained that she had been outside her home unloading groceries from her car when she saw a dark-colored foreign car drive by. The car slowed, stopped, and backed up. Three men got out of the car and approached her. According to Officer Wentz's testimony, Ms. Alvarez said that one of the men took out a gun and pushed it into her side, and then in English told her to go into the house. Officer Kryger's account of what Ms. Alvarez said generally accorded with that of Wentz, although he testified that Ms. Alvarez had a strong belief there was a gun but he was not sure that she actually saw a gun or whether she said that she believed it was a gun rather than being certain that there was a gun.
¶ 7 The officers testified that once in the house, Ms. Alvarez was forced to the floor, her hands were tied, and her face was covered with a shirt. She told them that she thought the men were Hispanic because they spoke to each other in Spanish, which she also spoke. The men took her wallet, cash, credit cards, a ring removed from her finger, other jewelry, a jewelry box, a DVD (digital video disc) player, and the keys to her house and car. After she heard the men leave, Ms. Alvarez freed her hands[2] and called 911.
¶ 8 The officers went through the house and saw Ms. Alvarez's grocery bags knocked over and the contents of her purse spilled on the floor. They also found that someone had gone through the drawers in the master bedroom, taken the clothing out and dumped it on the floor, and moved the mattress off to the side to look underneath it. There was a pillowcase missing from the bed. The State introduced photographs showing the front room and Ms. Alvarez's purse and the contents that had been dumped out, the ties that bound her, the white t-shirt that had been *483 used to cover her head, and the groceries. Photographs were also introduced that showed the master bedroom had been ransacked.
¶ 9 The State also introduced evidence that on the same day that Ms. Alvarez was robbed, Mr. Koslowski's roommate, Brenda Duffy, was moving out of his residence. Duffy's daughter, Heather Killion, and others, including Glenn Dockins, were at Koslowski's residence that evening to help her move. Killion testified that Koslowski and a Hispanic male friend came home later in the evening and Koslowski showed her and Duffy some credit cards. She testified the cards were obviously stolen because they had an unfamiliar woman's name on them. Killion testified that she asked Koslowski to whom the cards belonged but he did not answer. Rather, she testified, he made the gesture of a gun with his right hand and she took this to mean that Koslowski had robbed a lady, although she also testified that she did not take it seriously. Later the same evening, according to Ms. Duffy's testimony, Mr. Koslowski gave Dockins a credit card that Dockins used to buy gas.
¶ 10 The State introduced evidence that the next day police responded to a report of a shooting at another residence (where the second home invasion occurred that led to Koslowski's other convictions). Police located a vehicle involved in that incident and learned it was registered to Koslowski. Numerous law enforcement officers then went to his residence. While investigating the shooting and second home robbery, officers questioned individuals present at the residence. Dockins was among them, and police discovered that he had a credit card in the name of Violet Alvarez. They traced a purchase made with the card at a gas station in Yakima the previous day and learned that Dockins had made the purchase.
¶ 11The jury returned a verdict of guilty on all counts. Koslowski was convicted of first degree robbery, first degree burglary, and first degree unlawful possession of a firearm as a result of the robbery at Ms. Alvarez's home. As explained, our review involves the Court of Appeals' reconsideration of the confrontation clause issue in light of Davis. The only issues concern admissibility of the statements that Ms. Alvarez made to the police officers.

ANALYSIS
¶ 12 Mr. Koslowski argues that his confrontation rights were violated when the officers testified about the statements that Ms. Alvarez made. He contends that the statements were testimonial under the analysis in Davis and their admission therefore erroneous. A confrontation clause challenge is reviewed de novo. State v. Mason, 160 Wash.2d 910, 922, 162 P.3d 396 (2007), cert. denied, ___ U.S. ___, 128 S.Ct. 2430, 171 L.Ed.2d 235 (2008).
¶ 13 The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The confrontation clause "applies to `witnesses' against the accused-in other words, those who `bear testimony.'" Crawford, 541 U.S. at 51, 124 S.Ct. 1354 (citation omitted). As noted above, it "bars `admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" Davis, 547 U.S. at 821, 126 S.Ct. 2266 (quoting Crawford, 541 U.S. at 53-54, 124 S.Ct. 1354).[3]
¶ 14 Ms. Alvarez's statements were made to police officers responding to a report of a crime. The Court said in Crawford, 541 U.S. at 52, 124 S.Ct. 1354, that statements taken by police officers during interrogations[4] are *484 testimonial. Subsequently, however, when directly addressing statements made during police interrogation that occurred when officers responded to a crime scene, the Court in Davis made it clear that despite the seemingly broad sweep of Crawford's statement about police interrogation, not all police interrogation yields testimonial statements.[5] The Court explained:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Davis, 547 U.S. at 822, 126 S.Ct. 2266.
¶ 15 Crawford involved a witness's recorded statements in response to structured police questioning at the police station after the witness had been given Miranda[6] warnings. Davis involved companion cases. Davis itself concerned statements made by a victim of domestic violence during the course of a 911 call to the 911 operator. In the second case, Hammon v. State, 829 N.E.2d 444 (Ind. 2005), rev'd sub. nom Davis, 547 U.S. 813, 126 S.Ct. 2266, the statements were made to officers who responded to a reported domestic disturbance. The meaning of "testimonial" was explored through the Court's comparison of the circumstances in Crawford, Davis, and Hammon.
¶ 16 When comparing the circumstances in Crawford with those of Davis itself, the Court adopted four factors that help to determine whether the primary purpose of police interrogation is to enable police assistance to meet an ongoing emergency or instead to establish or prove past events: (1) Was the speaker speaking about current events as they were actually occurring, requiring police assistance, or was he or she describing past events? The amount of time that has elapsed (if any) is relevant. (2) Would a "reasonable listener" conclude that the speaker was facing an ongoing emergency that required help? A plain call for help against a bona fide physical threat is a clear example where a reasonable listener would recognize that the speaker was facing such an emergency.[7] (3) What was the nature of what was asked and answered? Do the questions and answers show, when viewed objectively, that the elicited statements were necessary to resolve the present emergency or do they show, instead, what had happened in the past? For example, a 911 operator's effort to establish the identity of an assailant's name so that officers might know whether they would be encountering a violent felon would indicate the elicited statements were nontestimonial. (4) What was the level of formality of the interrogation? The greater the formality, the more likely the statement was testimonial. For example, was the caller frantic and in an environment that was not tranquil or safe? Davis, 547 U.S. at 827, 126 S.Ct. 2266.
¶ 17 The Court also explained that a conversation could contain both testimonial and nontestimonial statements. A conversation that begins as an interrogation to learn *485 whether emergency assistance is needed may change and become testimonial once the emergency appears to have ended or the information necessary to meet the emergency has been obtained. Id. at 828, 126 S.Ct. 2266.
¶ 18 As mentioned, the second case before the Court in Davis, Hammon, involved statements made to police officers who responded to a report of a domestic disturbance at a residence. At issue were statements made by Amy Hammon. No ongoing emergency was apparent, the Court reasoned, because she told an officer when he arrived that things were fine and the officer heard no argument or crashing and saw no one throw or break anything. Id. at 828-29, 126 S.Ct. 2266. The Court concluded that at the time the statements at issue were elicited the officer was trying to determine what had happened, not what was happening. Id. at 830, 126 S.Ct. 2266. With regard to formality, the Court agreed that Amy's interrogation occurred under less formal circumstances than the interrogation in Crawford. Id. However, it was "formal enough that [her] interrogation was conducted in a separate room, away from her husband ..., with the officer receiving her replies for use in his `investigat[ion].'" Id. (third alteration in original). The Court explained that in both Crawford and Hammon, the declarants were separated from the defendants, "[b]oth statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed," and "both took place some time after the events described were over." Id. The Court said that "[s]uch statements under official interrogation are an obvious substitute for live testimony, because they do precisely what a witness does on direct examination; they are inherently testimonial." Id. The Court did "not dispute that formality is indeed essential to testimonial utterance," and added that "[i]t imports sufficient formality, in our view, that lies to [examining police officers] are criminal offenses." Id. at n. 5.
¶ 19 Then, with regard to whether there was an ongoing emergency in Hammon, the Court rejected the argument that Amy's statements were like those in Davis, where the declarant's statements were made during the course of a frantic 911 call seeking protection from the defendant. The Court explained that unlike the circumstances in Hammon, the statements in Davis were taken while the declarant was alone, unprotected by police, in apparent immediate danger from the defendant, and seeking aid, not relating past events. Id. at 831-32, 126 S.Ct. 2266.
¶ 20 The Court rejected the implication that "virtually any `initial inquiries' at the crime scene will" be nontestimonial but also refused to hold that no questions at the crime scene will yield nontestimonial answers. Id. at 832, 126 S.Ct. 2266. In the case of domestic disputes the investigating officers will need to determine with whom they are dealing in order "`to assess the situation, the threat to their own safety, and possible danger to the potential victim.'" Id. (quoting Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)). These exigencies, the Court said, "may often mean that `initial inquiries' produce nontestimonial statements." Id. However, the Court said, where the statements are neither a cry for help nor provision of information that will enable officers immediately to end a threatening situation, it is immaterial that the statements were given at an alleged crime scene and were "initial inquiries." Id.
¶ 21 Here, Mr. Koslowski contends that there was no emergency or current crime in progress at the time Sergeant Wentz arrived at Ms. Alvarez's home, or any immediate threat to her safety. He maintains that Wentz was not seeking to determine what was happening but rather what had happened, i.e., the purpose of the investigation and questions were to gather information and investigate a possible past crime and facts relevant to a possible later criminal prosecution. The State, on the other hand, contends that the circumstances here are more akin to a call for emergency assistance than a mere report of a crime. The Court of Appeals agreed with the State that "Ms. Alvarez was seeking help and protection from the police" and "gave the officers information to apprehend an armed suspect." *486 Koslowski II, 139 Wash.App. 1014, 2007 WL 1719930, at *3. The court noted that Wentz testified that he was trying to get as much information as possible to relay to officers in the field. Id. Under these circumstances, the Court of Appeals determined, the statements were not testimonial. Id.
¶ 22 On the limited record we have before us and applying the factors established by the Court in Davis, we conclude that the statements were testimonial. We say "limited record" because at the time this case was tried, Crawford and Davis had not been decided and the evidence submitted and the arguments to the trial court reflect the fact that Roberts controlled at the time. There is abundant evidence about Ms. Alvarez's emotional state, for example, which was highly relevant under Roberts. The same level of detail about circumstances that are relevant under Davis is lacking. For example, we do not know what questions, exactly, were asked and how they were answered, nor do we know when, in the course of the interrogation, certain questions were asked and answered, or how long a time had elapsed when certain statements were made. This is not a matter of poor lawyering. Indeed, had this case been final when Crawford was decided, Crawford and Davis would not apply.
¶ 23 Given what the record does reveal, we begin with the first of the four factors established by the Court, whether the speaker was speaking about events as they actually occurred or describing past events. Ms. Alvarez was describing events that had already occurred. Nothing in her statements or the circumstances, as revealed by this record, indicates that the men who robbed her might return to the scene for any reason. The record shows that they had completed the robbery and left her residence and there is no evidence of any ongoing situation or relationship with Ms. Alvarez that might suggest she was still in danger from them. She had freed herself from the ties that bound her. Although the time that had elapsed was evidently short, she was describing past events and not events as they were actually happening. In contrast, the statements in Davis itself were taken while the 911 caller was alone, unprotected by police, and in apparent immediate danger from the defendant. She was seeking aid, not relating past events. Davis, 547 U.S. at 831-32, 126 S.Ct. 2266.[8]
*487 ¶ 24 The second factor is whether a reasonable listener would recognize that Ms. Alvarez was facing on ongoing emergency, such as in Davis itself where there was "plainly a call for help against a bona fide physical threat." Id. at 827, 126 S.Ct. 2266. Here, in contrast, the statements were made after police had arrived. A reasonable listener would certainly understand that Ms. Alvarez was frightened, as she clearly was, but nothing in the record indicates there was any reason to think that she faced any further threat after the robbers left, she was able to free herself, and the police arrived and were present to protect her. Rather, a reasonable listener would conclude that the danger had passed. See, e.g., State v. Kirby, 280 Conn. 361, 386, 908 A.2d 506 (2006) (any emergency had ended because the crimes were no longer in process and the victim was protected by the police officer's presence at her home; the police officer's presence and fact that the defendant was located some miles away rendered the primary purpose of the interrogation investigatory and the victim's answers to the officers questions testimonial); People v. Trevizo, 181 P.3d 375, 379 (Colo.App.) (when, at the time a woman's statements were made to officers responding to a 911 call, there was no immediate threat to her, the defendant had fled the scene, and the police had control of the situation, there was no ongoing emergency and the statements were testimonial), cert. denied, 2008 WL 5587533 (Colo.2008).
¶ 25 The State emphasizes, however, that Ms. Alvarez was distraught when she gave her statements. As the court in Shea noted, the fact that the victim or other complainant is distressed is not dispositive of whether an emergency exists because in some cases, like domestic assault cases, the victim may be upset long after the emergency situation has been resolved. State v. Shea, 2008 VT 114, 965 A.2d 504, 509, ¶ 17. In Kirby, 280 Conn. at 385 n. 19, 908 A.2d 506, the court cautioned against treating a telephone report of a past violent crime where the victim was hysterical and possibly in need of medical care as showing an ongoing public safety emergency when the suspect was still at large. The court reasoned that to do so would render meaningless the Court's distinction in Davis between a past crime and an ongoing emergency. Id. In addition, in some cases an individual's emotional state could also be more reflective of the individual person's own emotional nature than indicative of an ongoing emergency.
¶ 26 In short, unless the victim's emotional state is related to the Davis analysis, the emotional state has little relevance to the question whether the individual's statements are testimonial. The victim's emotional state might be related to the Davis factors if it indicates, for example, the presence of a continuing danger or if it results in informal, unstructured police interrogation. Shea, 965 A.2d at 506, ¶ 7. Here, the record does not support the State's position that Ms. Alvarez's emotional state showed she was seeking help within the meaning of Davis. The United States Supreme Court explained in Davis that the inquiry is whether a "reasonable listener" would conclude that the speaker was facing an ongoing emergency that required help. What is missing here is, as explained, any evidence from which to conclude that there was an ongoing emergency requiring help, such as a bona fide physical threat.[9]
*488 ¶ 27 The third factor is the nature of the interrogation, i.e., what was asked and answered and whether, viewed objectively, the elicited statements were necessary to resolve a present emergency rather than learn what happened in the past. The Court in Davis suggested that statements might be nontestimonial if police interrogation, objectively viewed, was an effort to establish an assailant's identity so that dispatched officers might know whether they would be encountering a violent felon. The State contends that Officer Wentz asked about the assailants in order to obtain information to relay to officers in the field for the purpose of identifying and apprehending the suspects, one of whom was armed.
¶ 28 As noted, initial inquiries at the scene of a crime might yield nontestimonial statements when officers need to determine with whom they are dealing in order to assess the situation and the threat to the safety of the victim and themselves. See, e.g., People v. Bradley, 8 N.Y.3d 124, 862 N.E.2d 79, 830 N.Y.S.2d 1 (2006) (where an officer responding to a 911 call was met at the door by a woman smeared with blood and asked her "what happened," the victim's response that the defendant had thrown her through a glass door was nontestimonial); Shea, 965 A.2d at 508-09, ¶ 14 (the court concluded in a domestic assault case that the officer's initial inquiries were for the purpose of determining whether an emergency existed, as shown by the minimal information sought during a very unstructured interview followed by the officer's search of the apartment to see if the defendant was still at the scene). But it is irrelevant that the statements were responsive to "initial inquiries" unless the statements were a cry for help in the face of an ongoing emergency or the statements provided information that would enable officers immediately to end a threatening situation. Davis, 547 U.S. at 832, 126 S.Ct. 2266.
¶ 29 Here, when the officers arrived the crime had already occurred. There is no evidence suggesting that police would encounter a violent individual at the residence and no evidence that the defendant or the other men were still in the vicinity. On this record, Ms. Alvarez was not in any apparent immediate danger, nor did any other individual face a threat from the robbers.[10]
¶ 30 Contrary to the State's argument, the mere fact that the suspects were at large and that Sergeant Wentz relayed the information he learned from Ms. Alvarez to officers in the field is not enough to show the questions asked and answered were necessary to resolve a present emergency situation. For example, the court in State ex rel. J.A., 195 N.J. 324, 949 A.2d 790 (2008), declined to find statements nontestimonial when the suspect remained at large where neither the declarant nor the victim was in danger. As the court observed, such an expansive declaration was implicitly rejected in Davis, where the Court commented with respect to Davis itself that once the abusive husband fled, ending the immediate emergency, it could be maintained that the wife's continuing statements to the 911 operator were testimonial. Id. at 348, 949 A.2d 790; see also, e.g., State v. Lewis, 361 N.C. 541, 549, 648 S.E.2d 824 (2007) (the fact that the defendant's location is unknown at the time of the interrogation does not in and of itself create an ongoing emergency).
¶ 31 If merely obtaining information to assist officers in the field renders the statements nontestimonial, then virtually any hearsay statements made by crime victims in *489 response to police questioning would be admissiblea result that does not comport with Crawford and Davis. The interrogation here involved learning about the crimes that had occurred and obtaining information to apprehend the suspects, not to acquire information necessary to resolve any current emergency.
¶ 32 We recognize that under some circumstances the fact that questioning concerns an at large suspect who is armed may, when considered with other evidence, indicate the interrogation is intended to resolve an ongoing emergency. In People v. Nieves-Andino, 9 N.Y.3d 12, 13, 872 N.E.2d 1188, 840 N.Y.S.2d 882 (2007), for example, a shooting victim had been shot in the early hours of the day and within minutes two officers arrived. One went to the victim, who was lying between two parked cars, and asked what happened. Id. at 13-14, 840 N.Y.S.2d 882, 872 N.E.2d 1188. The victim responded that he had argued with the defendant and the defendant shot him. This statement was held to be nontestimonial because the inquiry was intended to deal with an ongoing emergency since, in light of the speed and sequence of events, the officer could not be certain that the assailant posed no further danger to the victim or onlookers. Id. at 15-16, 840 N.Y.S.2d 882, 872 N.E.2d 1188. The court reasoned that the brief inquiry was part of the officer's reasonable effort to assess what had happened and whether there was any continuing danger. Id. at 16, 840 N.Y.S.2d 882, 872 N.E.2d 1188.
¶ 33 Similarly, in State v. Ayer, 154 N.H. 500, 509-10, 917 A.2d 214 (2006), the interrogating officer knew only that a shooting of an unarmed victim had occurred just moments before in broad daylight and did not know whether the suspect was armed or threatening, whether he was still in or would return to the immediate area, or whether any potential witnesses or other members of the public would become targets, under chaotic circumstances filled with police, medical personnel, and bystanders. The court held that information obtained about the perpetrator through the interrogation was nontestimonial. The court did not believe that under these circumstances any rational police officer would believe the emergency had ended or that the officer's primary purpose in asking questions was to obtain evidence relevant to a possible future prosecution. Id. at 510, 917 A.2d 214; see also United States v. Arnold, 486 F.3d 177, 178-79 (6th Cir.2007) (statements were nontestimonial where the witness said that the armed defendant had threatened to kill her and he was still in the vicinity), cert. denied, ___ U.S. ___, 128 S.Ct. 871, 169 L.Ed.2d 736 (2008).
¶ 34 Here, however, the evidence about the interrogation discloses only that one of the suspects was likely armed, without any additional evidence indicating that Ms. Alvarez, the officers, or another person, such as an onlooker or potential witness, was in danger.[11]
*490 ¶ 35 As to the fourth factor, it may have been that Ms. Alvarez's emotional state caused the interrogation to be less formal than it otherwise might have been. Also, the questioning at her home was certainly less formal than the police station taped interrogation in Crawford. On the other hand, as the Court noted in Davis, a certain level of formality occurs whenever police engage in a question-answer sequence with a witness.
¶ 36 Finally, the State cites several cases that it urges support its position that the statements in this case are not testimonial. However, each case is readily distinguishable. First, in State v. Reardon, 168 Ohio App.3d 386, 2006-Ohio-3984, 860 N.E.2d 141, the officers arrived on the scene in a residential neighborhood and saw the suspects fleeing on foot, and a 911 call had reported a home had been invaded. But there was no information establishing how many suspects there were or how heavily armed they were. The officers needed to ensure their safety and the safety of those in the neighborhood from violent men loose in the neighborhood. Id. at 390, ¶ 16, 391, ¶ 18, 860 N.E.2d 141. The circumstances in Reardon show that an ongoing emergency existed, in contrast to the circumstances here where the suspects had fled by car before the officers arrived. In United States v. Clemmons, 461 F.3d 1057, 1061 (8th Cir.2006), a shooting victim was lying in front of a neighbor's house suffering from multiple gunshot wounds. The officer parked several blocks from the scene because there could be an armed suspect. Id. The officer's testimony established that when he spoke to the victim he was investigating his medical condition and trying to determine who the assailant was. Id. Under the circumstances, there was clearly an ongoing emergency since (1) the victim had been shot and likely needed medical attention for gunshot wounds and (2) the officer did not know if the armed suspect was in the vicinity, as shown by his testimony about where he parked and why.[12]
¶ 37 Considering all the Davis factors and the rest of the analysis in Davis, which expressly addresses statements by a victim during interrogation by police officers who respond to a report of a crime, we conclude, on this record, that the statements were testimonial. They were made in the course of police interrogation under circumstances objectively indicating that there was no ongoing emergency and the primary purpose of the interrogation was to establish past events potentially relevant to later criminal prosecution. The State has not established the statements were nontestimonial because it has not established that the circumstances objectively indicate the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency.[13] Because *491 Ms. Alvarez was unavailable to testify and Mr. Koslowski had no prior opportunity for cross-examination, admitting the officers' testimony about her statements at trial violated his right to confrontation.
¶ 38 Error in admitting evidence in violation of the confrontation clause is subject to a constitutional harmless error test. Lilly v. Virginia, 527 U.S. 116, 139-40, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999); Mason, 160 Wash.2d at 927, 162 P.3d 396. If the untainted evidence is so overwhelming that it necessarily leads to a finding of the defendant's guilt, the error is harmless. Id.; State v. Guloy, 104 Wash.2d 412, 426, 705 P.2d 1182 (1985).
¶ 39 Mr. Koslowski was convicted of first degree robbery, first degree burglary, and first degree unlawful possession of a firearm. To uphold each of these convictions, we would have to find overwhelming, untainted evidence that Mr. Koslowski was armed.[14] The State argues that there is such evidence, relying on Ms. Killion's testimony that when she asked Koslowski to whom the credit cards belonged that he displayed to her and her mother, he did not answer but made the gesture of a gun with his right hand, and evidence that Koslowski attempted to rob another person with a firearm the following day. We disagree with the State and conclude that this is not overwhelming evidence that Koslowski was armed at the time of the crimes involving Ms. Alvarez and therefore there is not overwhelming, untainted evidence necessarily leading to a finding of guilt of first degree robbery, first degree burglary, and first degree unlawful possession of a firearm. Accordingly, these convictions must be reversed.

CONCLUSION
¶ 40 Under Davis, a witness's statements are nontestimonial when made in the course of a police interrogation under circumstances that objectively indicate the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. Where the witness is the victim of a crime, the fact that the victim is fearful and seeks police assistance is not, in and of itself, enough to establish an ongoing emergency, i.e., the determination is not made based on the perceptions of the victim. Here, Ms. Alvarez's assailants had fled the scene in a car before police arrived and there is no evidence suggesting they might return or that they posed any further danger to any identifiable person. The emergency had passed. Instead, the circumstances show that the primary purpose of the police interrogation was to establish past events potentially relevant to later criminal prosecution. Therefore the statements were testimonial.
¶ 41 The confrontation clause bars admission of testimonial statements of a witness who does not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. *492 Because Mr. Koslowski had no prior opportunity for cross-examination, the admission of Ms. Alvarez's statements was constitutional error. This error was not harmless because without admission of these statements, there is not overwhelming, untainted evidence that Koslowski was armed at the time he committed the offenses involving Ms. Alvarez.
¶ 42 The Court of Appeals is reversed and this matter is remanded for further proceedings consistent with this opinion.
WE CONCUR: CHAMBERS, OWENS, FAIRHURST, and STEPHENS, JJ.
SANDERS, J. (concurring).
¶ 43 The majority holds that Violet Alvarez's statements to the police were testimonial and the admission of those statements at trial was not harmless error because there was not overwhelming, untainted evidence that Duane Koslowski was armed. Majority at 491. I concur in the result, but disagree with the use of the "overwhelming evidence" test. That is not the proper test to determine if an error is harmless.
¶ 44 We may excuse as "harmless error" only an "error which is trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case." State v. Britton, 27 Wash.2d 336, 341, 178 P.2d 341 (1947). In other words, an error is harmless only if does not affect the evidence properly presented to the jury. Whether or not in our opinion there is overwhelming evidence should not be a consideration.
¶ 45 "[I]t is impossible for courts to contemplate the probabilities any evidence may have upon the minds of the jurors." State v. Robinson, 24 Wash.2d 909, 917, 167 P.2d 986 (1946). The assumption a court "can determine what evidence or instruction influenced the jury's decision" is "a tacit admission that an appellate court is necessarily engaging in fact-finding." Dennis J. Sweeney, An Analysis of Harmless Error in Washington: A Principled Process, 31 Gonz. L.Rev. 277, 279 (1995-96).
¶ 46 Accordingly, I concur.
ALEXANDER, C.J. (dissenting).
¶ 47 I dissent from the majority's determination that all of Ms. Violet Alvarez's statements to Officers Nolan Wentz and Michael Kryger were testimonial. I would hold that Ms. Alvarez's initial statements to the police officers were nontestimonial and, therefore, admissible under the excited utterance exception to the hearsay rule. Accordingly, I believe there is sufficient evidence to support the jury's guilty verdicts. Thus, I would affirm the Court of Appeals' decision upholding Duane Koslowski's convictions.

CONFRONTATION CLAUSE
¶ 48 In holding that all of Ms. Alvarez's statements to Officers Wentz and Kryger were testimonial, the majority incorrectly applies the test announced in the consolidated cases of Davis v. Washington and Hammon v. Indiana, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and subsequently applied by this court in State v. Ohlson, 162 Wash.2d 1, 168 P.3d 1273 (2007).
¶ 49 The four-factor "primary purpose test" announced in Davis "requires courts to make an objective appraisal of the interrogation itself." Id. at 11, 168 P.3d 1273. "Characteristics to consider when objectively assessing the circumstances of the interrogation include the timing of the statements, the threat of harm, the need for information to resolve a present emergency, and the formality of the interrogation." Id. at 15, 168 P.3d 1273. "Th[e] list of factors is not necessarily exclusive, nor does any one factor necessarily determine the purpose of the interrogation in every case." Id. at 22, 168 P.3d 1273 (Chambers, J., concurring).
¶ 50 The focus of the primary purpose test is on the declarant's statements. Davis, 547 U.S. at 822 n. 1, 126 S.Ct. 2266. As we noted in Ohlson, "`of course ... it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate.'" Ohlson, 162 Wash.2d at 11, 168 P.3d 1273 (emphasis added) (alteration in original) (quoting Davis, 547 U.S. at 822 n. 1, 126 S.Ct. 2266).
*493 ¶ 51 In Davis, the United States Supreme Court emphasized that "`we do not hold ... that no questions at the scene will yield nontestimonial answers.'" Ohlson, 162 Wash.2d at 14, 168 P.3d 1273 (quoting Davis, 547 U.S. at 832, 126 S.Ct. 2266). As the Court explained, "`"[o]fficers called to investigate... need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." Such exigencies may often mean that "initial inquiries" produce nontestimonial statements.'" Ohlson, 162 Wash.2d at 14, 168 P.3d 1273 (quoting Davis, 547 U.S. at 832, 126 S.Ct. 2266 (alteration in original) (quoting Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004))).
¶ 52 Applying the test from Davis and the precedent of Ohlson to the record before us, I would hold that Ms. Alvarez's initial statements were nontestimonial.[1] My analysis distinguishes Ms. Alvarez's "initial statements" to Officers Wentz and Kryger from the "subsequent statements" she made to the officers. The record shows that she made her initial statements immediately or shortly after the officers' respective arrivals on the scene.[2] These statements include those made between the moment Officer Wentz arrived and the point where the officers had Ms. Alvarez walk them through the scene. See 3 Verbatim Report of Proceedings (VRP) (Jan. 29, 2003) at 321-25, 331-37; cf. Ohlson, 162 Wash.2d at 18, 168 P.3d 1273 (describing similar crime scene statements made by victims to a police officer as the information "necessitated" by the officer's "initial triage of the situation."). Her subsequent statements include, for example, those made to Officer Kryger during his inventory of the residence. See, e.g., 3 VRP (Jan. 29, 2003) at 337-38 (Ms. Alvarez indicated to Officer Kryger that a jewelry box and pillowcase were missing.). Significantly, the record indicates that Ms. Alvarez's statements concerning the gun[3] were part of her initial statements to both officers. Id. at 323, 333.
¶ 53 Beginning with the first factor of the primary purpose test, with respect to the timing of Ms. Alvarez's initial statements, they were made to Officers Wentz and Kryger an "evidently short" amount of time after the robbers left her residence and within minutes of the 911 call. Majority at 486. Ms. Alvarez called 911 after hearing the robbers drive away and freeing herself from the wire ties, and Officer Wentz arrived at her home two minutes later in response to the call. Upon arriving, Officer Wentz began making his initial inquiries. Similarly, in Ohlson, the victims' statements were made "within minutes of the assault" and the investigating officer's initial inquires began within five minutes of the 911 call. Ohlson, 162 *494 Wash.2d at 17, 168 P.3d 1273. Like the victims in Ohlson, while Ms. Alvarez "was not `speaking about the events as they were actually happening,' the statements were made contemporaneously with the events described." Id. (quoting Davis, 547 U.S. at 827, 126 S.Ct. 2266).
¶ 54 The majority incorrectly defines the first factor of the Davis test as "whether the speaker was speaking about events as they actually occurred or describing past events." Majority at 486. In Ohlson, this court rejected such narrow analysis as being "inconsistent with the Court's emphasis [in Davis]... [, which] supports a more nuanced approach when considering the timing of a statement than merely noting whether a declarant phrased his or her statement using past or present tense." Ohlson, 162 Wash.2d at 14-15, 168 P.3d 1273 (citation omitted). We explained that "[i]nformation essential to assessing a situation will necessarily sometimes include recitations of events that occurred in the past, if only by a matter of minutes." Id. at 14, 168 P.3d 1273. Here, Ms. Alvarez was reciting events that occurred in the past, but only by a matter of minutes.
¶ 55 Insofar as the second factor of the primary purpose test is concerned, whether a reasonable listener would recognize that Ms. Alvarez was facing a threat of harm, this case falls between Ohlson and Hammon. See Davis, 547 U.S. at 829-30, 126 S.Ct. 2266 (victim in Hammon told police upon their arrival that she was fine and there was no immediate threat to her person); Ohlson, 162 Wash.2d at 18, 168 P.3d 1273 (circumstances indicated assailant might return to the scene). I believe this factor was met until a reasonable listener, under these circumstances, would have recognized that Ms. Alvarez did not require medical assistance and that there was no reasonable threat of physical harm to her.
¶ 56 The majority claims that "it is highly significant that the officers were present to protect Ms. Alvarez." Majority at 489 n. 11 (citing Davis, 547 U.S. at 830, 126 S.Ct. 2266). Although the majority makes this statement in analyzing the third factor, the presence of officers on the scene is relevant to our analysis under the second factor. See Ohlson, 162 Wash.2d at 18, 168 P.3d 1273. We distinguished Ohlson from Hammon on this basis, stating that even though the responding officer was present, "unlike Hammon, the police could not `actively separate[]' Ohlson from D.L. and `forcibly prevent[]' Ohlson from harming D.L.Ohlson's identity and location were unknown." Id. (alteration in original) (quoting Davis, 547 U.S. at 830, 126 S.Ct. 2266). For the same reason, this case may be distinguished from Hammon: though Officers Wentz and Kryger were present, they could not "actively separate[]" the robbers from Ms. Alvarez, and could not "forcibly prevent[]" the robbers from harming Ms. Alvarezthe robbers' identity and location were unknown. Davis, 547 U.S. at 830, 126 S.Ct. 2266. Accordingly, the presence of the officers in this case does not support the majority's conclusion with regard to the third factor. Rather, it supports my conclusion regarding the second factor.
¶57 The third factor, as noted above, is whether Ms. Alvarez's initial statements to Officers Wentz and Kryger were necessary to resolve an ongoing emergency. In Ohlson, we held that an ongoing emergency existed at least until the first responding officer arrived at the scene and completed what was described as her "initial triage" of the situation. Ohlson, 162 Wash.2d at 18, 168 P.3d 1273. This process included the officer's initial inquiries to the victims seeking information essential to determining whether there was ongoing danger to the victims or any threat to the community or the officer and her fellow officers. Id. (holding the initial triage necessitated the information obtained from the victims). Here, when Officers Wentz and Kryger arrived at Ms. Alvarez's residence all that was known about the situation was what the 911 call reportedthat a home invasion robbery involving three suspects had just occurred and the suspects had fled in a vehicle. 3 VRP (Jan. 29, 2003) at 321, 331. It was, accordingly, the officers' immediate top priority to complete their initial assessment of the situation and determine whether there was an ongoing danger to Ms. Alvarez or any threat to the community or themselves and their *495 fellow police officers. See Ohlson, 162 Wash.2d at 18, 168 P.3d 1273; see also 1 VRP (Jan. 13, 2003) at 113 (Officer Wentz's initial inquiries to Ms. Alvarez were made for the purpose of "get[ting] as much information as [he] could to give to the other officers in the field."). Thus, under Ohlson, at least until Officers Wentz and Kryger completed their initial assessment of the situation, which necessitated the information obtained from Ms. Alvarez's initial statements, the situation presented an ongoing emergency.
¶ 58 The majority's analysis under this factor emphasizes that there was no evidence the police would encounter violent individuals in Ms. Alvarez's residence or the vicinity. Majority at 488. However, with regard to the location of the perpetrator when the declarant's statements are made, "the critical consideration is not whether the perpetrator is or is not at the scene, but rather whether the perpetrator poses a threat of harm, thereby contributing to an ongoing emergency." Ohlson, 162 Wash.2d at 15, 168 P.3d 1273. Thus the majority's emphasis is misplaced.
¶ 59 The majority concedes that an armed suspect who is at large may constitute an ongoing emergency "when considered with other evidence." Majority at 489. I believe the "other evidence" in this case, added to the at large status of the suspects, demonstrates that there was an ongoing emergency when Ms. Alvarez made her initial statements to Officers Wentz and Kryger. In fact, at least one of the cases cited by the majority supports this conclusion. Majority at 489 (citing United States v. Arnold, 486 F.3d 177 (6th Cir.2007)). In Arnold, the court held that an ongoing emergency existed where a witness told police that a suspect had pulled a gun and threatened to kill her. Arnold, 486 F.3d at 190. "Other evidence" noted by the court included (1) the armed suspect remained at large, (2) the suspect did not know that the witness had called 911, and (3) neither the witness nor the officers knew whether the suspect remained armed and in the nearby vicinity. Id. Similarly, the "other evidence" in this case includes (1) when Officer Wentz and Kryger arrived, the robbers remained at large and one of them was armed, (2) there is no evidence that the robbers knew Ms. Alvarez called 911, and (3) neither Ms. Alvarez nor the officers knew whether the robbers remained armed and in the vicinity. Thus, as in Arnold, there was an ongoing emergency in this case. See also State v. Warsame, 735 N.W.2d 684, 694 (Minn.2007) (holding assailant's flight from crime scene constituted ongoing emergency, where victim told police that alleged assault involved a knife).
¶ 60 The majority reaches the opposite conclusion with regard to this factor, in part because there is no evidence that the robbers' vehicle was spotted in the area after the officers arrived. Majority at 489 n. 11. Nothing in Davis, however, suggests that whether statements are testimonial or montestimonial can be determined in hindsight by reference to what is learned subsequent to the statements being made. Rather, as our analysis in Ohlson demonstrates, we must objectively consider the statements at the time they were made. See Ohlson, 162 Wash.2d at 18, 168 P.3d 1273 (considering what was known and unknown, objectively viewing the course of events, when the officer arrived on the scene). In Ohlson, hindsight revealed that the assailant did not return to the scene after the officer arrived. Id. at 6, 18-19, 168 P.3d 1273. Nevertheless, we concluded that there was an ongoing emergency, in part because when the officer arrived on the scene "all that was known about the situation was [that] a speeding vehicle was trying to hit some juveniles." Id. at 18, 168 P.3d 1273 (also concluding there as a threat of harm to the victim, in part because there was no way to know whether the assailant might return to the scene). Thus, the majority's analysis conflicts with Ohlson in this regard because when Ms. Alvarez made her initial statements to the officers, objectively viewing the course of events, all that was known was that a robbery had just occurred and there was no way to know whether the robbers might return.
¶ 61 Finally, as to the fourth factor, the level of formality, the majority concedes that "the questioning at her home was certainly less formal than the police station taped interrogation in Crawford." Majority at 490. *496 The circumstances were also less formal than those in Hammon. There, the victim told police upon their arrival that she was fine and there was no immediate threat to her person, the official interrogation "was conducted in a separate room" from the assailant, the victim "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed," and the interrogation "took place some time after the events described were over." Davis, 547 U.S. at 830, 126 S.Ct. 2266. In contrast, Ms. Alvarez's interrogation was conducted shortly after the underlying robbery occurred while she was frightened, upset, and extremely emotional.
¶ 62 For the above reasons, I conclude that the initial statements made by Ms. Alvarez to Officers Wentz and Kryger were nontestimonial. The circumstances of the interrogation objectively indicate that the primary purpose of the officers' initial inquiries was to enable police assistance to meet an ongoing emergency. I would hold, therefore, that the trial court's admission of Ms. Alvarez's initial statements did not violate Koslowski's Sixth Amendment right to confrontation.

EXCITED UTTERANCE
¶ 63 Having concluded that Ms. Alvarez's initial statements are nontestimonial, I next consider whether those statements fit within a specific hearsay exception. The State argues that the trial court properly admitted Ms. Alvarez's statements as excited utterances. I agree.[4]
¶ 64 "This court reviews for abuse of discretion a trial court's decision to admit a hearsay statement as an excited utterance." Ohlson, 162 Wash.2d at 7-8, 168 P.3d 1273 (citing State v. Woods, 143 Wash.2d 561, 597, 23 P.3d 1046 (2001); State v. Strauss, 119 Wash.2d 401, 417, 832 P.2d 78 (1992)). We will not reverse the trial court's decision "`unless we believe that no reasonable judge would have made the same ruling.'" Id. at 8, 168 P.3d 1273 (quoting Woods, 143 Wash.2d at 595-96, 23 P.3d 1046).
¶ 65 ER 803(a)(2) indicates that a statement is not excluded as hearsay if it is an excited utterance "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." We have previously stated that three "closely connected requirements" must be satisfied for a hearsay statement to qualify as an excited utterance, including, (1) a startling event or condition must have occurred, (2) the declarant must have made the statement while under the stress or excitement of the startling event of condition, and (3) the statement must relate to the startling event or condition. Ohlson, 162 Wash.2d at 8, 168 P.3d 1273 (citing Woods, 143 Wash.2d at 597, 23 P.3d 1046; State v. Chapin, 118 Wash.2d 681, 686, 826 P.2d 194 (1992)). The first and third requirements are met here because the underlying robbery clearly constituted a startling event and Ms. Alvarez's initial statements related to the robbery.
¶ 66 As for the second requirement, it is met because Ms. Alvarez remained under the stress caused by the underlying assault when she made her initial statements to Officers Wentz and Kryger. See 3 VRP (Jan. 29, 2003) at 322, 332 (Officers described Ms. Alvarez as "extremely emotional, very upset," "very pale," with a "very shaky voice" and "very, very frightened, scared."). As noted, her initial statements were made to the officers immediately or shortly after their respective arrivals. 1 VRP (Jan. 13, 2003) at 113, 116; 3 VRP (Jan. 29, 2003) at 322. Although the precise amount of time between the underlying robbery and the time of her initial statements is not entirely clear from the record, it is not an issue here because it is apparent that a prolonged period of time had not passed. See Woods, 143 Wash.2d at 599-601, 23 P.3d 1046 (statements made 45 minutes after assailant left the crime scene were properly admitted); see also State v. Flett, 40 Wash.App. 277, 287, 699 P.2d 774 (1985) (statements made seven hours after rape deemed properly admitted upon finding *497 of "continuing stress" between time of rape and statement).
¶ 67 The three requirements of the excited utterance hearsay exception are satisfied. Accordingly, I would hold the trial court properly admitted Ms. Alvarez's initial statements as excited utterances.

SUFFICIENCY OF THE EVIDENCE
¶ 68 Because I would hold Ms. Alvarez's initial statements were properly admitted by the trial court, I must, finally, consider whether there is sufficient evidence to support Koslowski's convictions. "Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." State v. Thomas, 150 Wash.2d 821, 874, 83 P.3d 970 (2004) (citing State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992)). "Circumstantial evidence and direct evidence are equally reliable." Id. (citing State v. Delmarter, 94 Wash.2d 634, 638, 618 P.2d 99 (1980)). "This court must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." Id. at 874-75, 83 P.3d 970 (citing State v. Cord, 103 Wash.2d 361, 367, 693 P.2d 81 (1985)).
¶ 69 To uphold each of Koslowski's convictions, there must be sufficient evidence that Koslowski was armed. See majority at 489 n. 11. As noted, Ms. Alvarez's initial statements included her statements concerning the gun. 3 VRP (Jan. 29, 2003) at 323, 333. Additional evidence indicating Koslowski was armed includes Ms. Heather Killion's testimony regarding Koslowski's gesture of a gun and evidence that Koslowski attempted to rob another person with a firearm the following day. In light of these facts, it is my judgment that there is sufficient evidence that Koslowski was armed to support his convictions. I would, therefore, affirm the jury's guilty verdicts for first degree robbery, first degree burglary, and first degree unlawful possession of a firearm.[5]

CONCLUSION
¶ 70 For the aforementioned reasons, I dissent from the majority's determination. In my view, we should uphold the decision of the Court of Appeals affirming Koslowski's convictions.
WE CONCUR: C. JOHNSON and J. JOHNSON, JJ.
NOTES
[1] The United States Supreme Court has held that Crawford does not apply retroactively to cases already final on direct review. Whorton v. Bockting, 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). Crawford and Davis apply, however, because Mr. Koslowski's case was still pending on direct review when they were filed.
[2] Officer Kryger testified that it appeared the wire ties had been incorrectly closed.
[3] At oral argument the State agreed, as it should, that it has the burden of establishing Ms. Alvarez's statements were nontestimonial. See, e.g., United States v. Arnold, 486 F.3d 177, 192 (6th Cir.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 871, 169 L.Ed.2d 736 (2008); State v. Bentley, 739 N.W.2d 296, 298 (Iowa 2007), cert. denied, ___ U.S. ___, 128 S.Ct. 1655, 170 L.Ed.2d 386 (2008); State v. Caulfield, 722 N.W.2d 304, 308 (Minn.2006).
[4] "Interrogation" is not meant in a formal sense, but rather in a colloquial manner. Crawford, 541 U.S. at 53 n. 4, 124 S.Ct. 1354.
[5] The Court explained in Davis that when it said in Crawford that "`interrogations by law enforcement officers fall squarely within [the] class' of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." Davis, 547 U.S. at 826, 126 S.Ct. 2266 (alteration in original) (quoting Crawford, 541 U.S. at 53, 124 S.Ct. 1354).
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[7] Courts have recognized that there are two ways in which an ongoing emergency may exist: first, when the crime is still in progress, and second, when the victim or the officer is in danger, either because of the need for medical assistance or because the defendant poses a threat. State v. Shea, 2008 VT 114, 965 A.2d 504, 508, ¶ 14. The first type occurred in Davis itself, where the 911 caller was reporting an ongoing crime. As to the second, in Anderson v. State, 163 P.3d 1000 (Alaska App.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 1486, 170 L.Ed.2d 306 (2008), for example, the victim was unable to move on his own or to breathe comfortably and needed medical assistance, thus an emergency existed.
[8] The dissent distinguishes between Ms. Alvarez's "initial statements," which the dissent describes as those made immediately or shortly after the officers respective arrivals on the scene, and her other statements. Dissent at 493. The dissent concludes the "initial statements," which include references to one of the suspects having a gun, were nontestimonial, while the later statements were testimonial. The dissent says that the "initial statements" were made within minutes of the robbery. The record does not support the dissent's conclusion.

The record shows that Ms. Alvarez was tied and left on the floor of her residence. It does not disclose how long it took for her to free herself from the restraints used to tie her. The record also does not disclose how much time elapsed between the time the robbery occurred and Ms. Alvarez's 911 call. The dissent's analogy to the period of time that elapsed in State v. Ohlson, 162 Wash.2d 1, 168 P.3d 1273 (2007), where the statements at issue were made about five minutes after an assault, is pure speculation.
Moreover, we do not know whether Ms. Alvarez mentioned the gun to Officer Wentz, the first officer on the scene, prior to Officer Kryger's arrival. None of the testimony says that she did (or that she did not). We do know that after Officer Kryger arrived Wentz had her begin again her description of what had happened. We also do not know how long after Kryger arrived they were told about the gun. Given that we do not know how long it took for Ms. Alvarez to free herself and call 911, it necessarily follows that even though we know that she did mention a gun at some point (according to the officers' testimony), we have no way of knowing how much time had passed since she was robbed. The dissent's partition of the "initial" statements and later statements is artificial and unhelpful, given the lack of evidence as to the timing of events.
The dissent contends that it is inappropriate to consider whether the speaker was speaking about events as they actually occurred or was speaking about past events, saying that in Ohlson we adopted a "`more nuanced approach.'" Dissent at 494 (quoting Ohlson, 162 Wash.2d at 14-15, 168 P.3d 1273). In Davis, the Court twice referred to the distinction as being between "what is happening" and "what happened." Davis, 547 U.S. at 827, 126 S.Ct. 2266 (with regard to the circumstances in Davis; the difference between "speaking about events as they were actually happening, rather than `describ[ing] past events'" (alternation in original) (citation omitted)); id. at 830, 126 S.Ct. 2266 (with regard to the circumstances in Hammon; when the officer's questions "elicited the challenged statements, he was not seeking to determine (as in Davis) `what is happening,' but rather `what happened'"). It is obviously proper to speak of the difference in this way. However, it is not inconsistent to speak of past events in conjunction with an ongoing emergency and, in appropriate circumstances, considering all of the factors the Court identified, the fact that some statements are made with regard to recent past events does not cast them in testimonial stone.
[9] The dissent reasons that this factor was satisfied "until a reasonable listener, under the circumstances, would have recognized that Ms. Alvarez did not require medical assistance and that there was no reasonable threat of physical harm to her." Dissent at 494. There is nothing in Davis that permits a presumption that the victim was facing an ongoing emergency, much less a conclusive presumption that applies to all statements up until the point a reasonable listener would conclude that the victim was not injured or under threat of harm. As mentioned below in this opinion, and as we noted in Ohlson, the United States Supreme Court concluded that where the victim's statements are "`neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were "initial inquiries" is immaterial.'" Ohlson, 162 Wash.2d at 14, 168 P.3d 1273 (quoting Davis, 547 U.S. at 832, 126 S.Ct. 2266). The dissent's presumption that an ongoing emergency exists during an "initial" interrogation until it is affirmatively determined that none exists is untenable.
[10] This case is thus unlike Ohlson, 162 Wash.2d 1, 168 P.3d 1273, where we concluded that the circumstances of a police officer's interrogation of one victim of an assault objectively indicated that the officer's primary purpose was to enable police assistance to meet an ongoing emergency. The juvenile victim's statements to the officer were made within minutes of an assault by the defendant driving his vehicle up onto the sidewalk so close to the victims that they had to jump out of the way. Significantly, the defendant had left the scene once only to return five minutes later and escalate his behavior from yelling racial slurs to the physical assault. There was "no way to know, and every reason to believe, that Ohlson might return a third time and perhaps escalate his behavior even more." Id. at 18, 168 P.3d 1273. In contrast to the circumstances in Ohlson, here there are no circumstances indicating that the robbers might return.
[11] Viewed objectively, the facts do not support the dissent's conclusion that the third factor weighs in favor of finding the statements are nontestimonial. The dissent finds it relevant that the robbers did not know that Ms. Alvarez had called the police and that neither she nor the officers knew whether the robbers remained in the vicinity. Dissent at 495. The dissent concludes a ongoing emergency existed in light of these facts and the fact that the robbers were at large and one had a gun. Id. Officer Kryger testified that Ms. Alvarez explained that she told the robbers that she was not feeling well and her son was coming over, and that the robber with the gun then told the others in Spanish (in which she was fluent) that her son was coming and also told them to hurry. III Verbatim Report of Proceedings (Jan. 29, 2003) at 334-55, 347. The robbers completed the robbery and fled. They left in a vehicle and there is no evidence it was spotted in the area at the time the officers arrived or thereafter. There is no objective basis for concluding that any ongoing threat existed, and no basis for concluding that Ms. Alvarez's statements were necessary to be able to resolve any present emergency. Moreover, as mentioned, it is highly significant that the officers were present to protect Ms. Alvarez. This was also a key factor in Hammon, where the Court emphasized that the police separated Hammon's husband from her, when both were in the same residence. Davis, 547 U.S. at 830, 126 S.Ct. 2266. Here, as in Hammon, because Ms. Alvarez was protected by the police, her statements were not necessary for the purpose of resolving any present threat.

The dissent also misrepresents our analysis, saying that in disregard of the caution in Ohlson that whether the perpetrators are present is not dispositive we have incorrectly focused on whether the perpetrators were at the residence or in the vicinity. Dissent at 495. We have appropriately considered whether the evidence suggests the officers would encounter violent individuals at the residence or in the vicinity because such evidence is highly relevant to whether a threat of harm existed. Again, our analysis follows Davis, 547 U.S. at 827, 126 S.Ct. 2266 (viewed objectively, the nature of the questions and answers in Davis itself was such that the responses were necessary to resolve a present emergency, and this was "true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon" (emphasis added)).
[12] In Leavitt v. Arave, 371 F.3d 663 (9th Cir. 2004), also relied upon by the State, the court applied its understanding of the analysis to be used to determine what constitutes a testimonial statement based on its understanding of Crawford, but the analysis is inconsistent with Davis.
[13] The State maintains that nothing in Davis changed the law regarding law enforcement's response to emergency situations, and contends that the Court of Appeals correctly analyzed the issue of admissibility of Ms. Alvarez's statements in its original opinion. Koslowski I, 130 Wash. App. 1005, 2005 WL 3753136 at *13. The State asks this court to follow that analysis, which focused on the witness's purpose and understanding in initiating police contact and making the statement(s) at issue. The analysis originated in comments in Crawford setting out possible formulations of testimonial statements, none of which the Court in fact adopted. The Court of Appeals' original opinion also relies heavily on two cases that are no longer sound law, State v. Mason, 127 Wash.App. 554, 126 P.3d 34 (2005), aff'd on other grounds, 160 Wash.2d 910, 162 P.3d 396, and the state court decision in Hammon that was reversed by the United States Supreme Court in Davis, Hammon, 829 N.E.2d at 458, re'd, Davis, 547 U.S. 813, 126 S.Ct. 2266.

Davis sets out a different analysis, which must be applied to determine whether the statements at issue in this case are testimonial (as the Court of Appeals recognized on reconsideration). The four-factory inquiry as well as the rest of the analysis in Davis does not turn on the purpose and understanding of the victim/witness whose statements are at issue, and whatever else might be said of Crawford, the formulations of possible approaches to what constitute "testimonial statements" appearing in it do not take precedence over Davis.
[14] The unlawful possession conviction necessarily rests on the jury having found Koslowski was armed. See RCW 9.41.040. The to-convict jury instruction regarding first degree robbery directed the jury that to convict of this crime it would have to find that Koslowski was armed with a deadly weapon or displayed what appeared to be a firearm or other deadly weapon during commission of robbery. Clerk's Papers (CP) at 54; see RCW 9A.56.200(1). The to-convict instruction for burglary required that to convict of first degree burglary the jury had to find either that Koslowski was armed with a deadly weapon or that he assaulted a person during commission of the burglary. CP at 69; see RCW 9A.52.020. As is necessary for firearm enhancements, special verdict forms were submitted to the jury for determinations whether the offenses were committed while Koslowski was armed. The jury found by special verdict form that Koslowski was armed at the time he committed robbery. CP at 34. Another special verdict form shows that the jury found that Koslowski was armed with a firearm at the time he committed the burglary involving Ms. Alvarez, CP at 32, which, in addition to justifying a firearm enhancement, also necessarily establishes one of the two alternate means by which burglary can be committed in the first degree. We have no way of knowing, however, whether the jury's determination of guilt on the first degree burglary charge was actually based on Koslowski being armed or on Koslowski's having assaulted Ms. Alvarez and, if assault, the nature of the assault.
[1] The majority discusses the "limited" nature of the record before us. See majority at 486. The record is sufficient, however, to support the conclusion that Ms. Alvarez's initial statements were nontestimonial. In Ohlson, we held that the victims' statements were nontestimonial without citing or quoting the questions asked, exactly, of the victims by a police officer. Ohlson, 162 Wash.2d at 4-19, 168 P.3d 1273. Moreover, a review of the record in Ohlson reveals that it lacked the same details that the majority claims are missing from the record here. Compare majority at 486, with State v. Ohlson, No. 78238-5, VRP (June 30, 2004) at 88-94 (Wash.Sup.Ct. Oct. 18, 2007).
[2] Officer Wentz testified that he arrived at Ms. Alvarez's residence "[a]bout two minutes" after receiving a call. 3 VRP (Jan. 29, 2003) at 321. He said that his questioning took "[n]ot very long" and occurred within a time frame of "[j]ust a few minutes" after his arrival, and that Ms. Alvarez started making statements to him "right away." 1 VRP (Jan. 13, 2003) at 113, 116; 3 VRP (Jan. 29, 2003) at 322. Officer Kryger testified that it took him "approximately six or seven minutes" to get to Ms. Alvarez's residence after receiving a call. 3 VRP (Jan. 29, 2003) at 331. He indicated that upon his arrival he contacted Ms. Alvarez inside the home and she told him what happened.
[3] During the trial, Officers Wentz and Kryger both testified that Ms. Alvarez stated that one of the robbers had a gun. 3 VRP (Jan. 29, 2003) at 323 (Officer Wentz testified that Ms. Alvarez told him, "As she was gathering her groceries three men from that car approached her and one had a gun. He took the gun and pushed it in her side and then in English directed her to go into the house."), 333 (Officer Kryger testified that Ms. Alvarez "indicated that the subject had a handgun and had put it into her side."), 344 (Officer Kryger testified that Ms. Alvarez described "one subject with the gun who had brought her into the house."), 348 (Officer Kryger testified that Ms. Alvarez "had a strong belief there was a gun.").
[4] At a pretrial hearing, Koslowski's attorney conceded there was an excited utterance by Ms. Alvarez and indicated he did not object to her statements being admitted. 1 VRP (Jan. 13, 2003) at 119-20. Neither did he object to their admission at trial. 3 VRP (Jan. 29, 2003) at 320-49.
[5] I reach this holding without deciding whether Ms. Alvarez's subsequent statements were testimonial or nontestimonial and without analyzing them under the excited utterance exception to the hearsay rule. However, even if I held her subsequent statements were testimonial or were not excited utterances, and thus erroneously admitted by the trial court, I would affirm Koslowski's convictions under harmless error analysis. See Ohlson, 162 Wash.2d at 19 n. 4, 168 P.3d 1273 (violation of confrontation clause subject to harmless error analysis using the "`overwhelming untainted evidence'" test). Specifically, I would hold that there is overwhelming untainted evidence, including Ms. Alvarez's initial statements, to support Koslowski's convictions and I am convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in absence of the admission of her subsequent statements.