IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 77964-8-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| JASON LEE WILKES, | |
| Appellant. | FILED: August 12, 2019 |

CHUN, J. — Jason Wilkes appeals his conviction for second degree assault. At trial, the court admitted statements an unavailable witness made to a 911 operator and to police officers who first arrived at the scene. On appeal, Wilkes claims the admission of these statements violated the Confrontation Clause. He also argues that his trial counsel performed ineffectively by failing to call an expert witness and that the trial court erred by imposing $300 in legal financial obligations in his Judgment and Sentence. For the reasons discussed herein, we affirm Wilkes's conviction. And we remand to the trial court to strike the fees.

I.
BACKGROUND

In the summer of 2017, Wilkes lived with his daughter, Cassandra Kelich, his son-in-law, Matthew Kelich,[1] and his six-year-old grandson (Cassandra and Kelich's son).

---

[1] In the remainder of this opinion, for clarity, we refer to Cassandra Kelich by her first name and to Matthew Kelich by his last name. We intend no disrespect.

On June 23, 2017, Kelich told his son to sit down and eat his pizza. His son responded, "Fuck you." Kelich lost his temper and started shouting in foul language at his son. From his bedroom, Wilkes heard Kelich shouting. Concerned that Kelich was losing his temper, he went to the kitchen.

Wilkes said that once he entered the kitchen, Kelich turned towards him and raised his fist. Wilkes said he felt that he needed to defend himself. He pushed Kelich into the corner of the kitchen and then punched him in the eye. Because Wilkes did not believe one punch would incapacitate Kelich, he hit him seven to ten more times. Kelich contended that Wilkes strangled him, but Wilkes denied this.

Shayna Blount, a friend of Cassandra's, was at the house with her children when the fight began. Blount left the house with all the children and called 911. When the operator asked how he could help, Blount told him, "My best friend's father is beating up her husband and she is not here. But there's three kids. I left with the kids and we're at the neighbor's house but we need the police and probably an ambulance here." The operator then asked if the fight involved any weapons. Blount said, "[N]o but we need help. We need help." Blount stated Kelich was "bleeding out of his face [and] out of his ears." Blount then answered questions regarding Wilkes's race, height, build, and age.

During the phone call, Wilkes walked out of the house. Blount told him to get back inside because he was scaring the children. Wilkes complied. The operator assured Blount that officers were on their way. Blount responded, "We

2

just need them here now. Like bad." By the end of the call, Blount told the operator, "Well, we're with the neighbor now so everything is fine."

The police arrived 14 minutes after Blount called 911. Officer Jeremy King arrived at the scene first. To ensure officer safety, Officer King parked down the street and waited for another officer. Officer Matthew Mishler arrived shortly thereafter. Blount ran to the police and told them about the fight. Believing Wilkes was inside, the police went into the house. But Wilkes had fled out the back door. The police then used a tracking dog to locate him in the backyard bushes of a nearby business. The police arrested Wilkes.

On July 12, 2017, the State charged Wilkes with second degree assault domestic violence. On November 14, 2017, the State amended the information to add aggravated domestic violence, accusing Wilkes of committing the assault against a family or household member and within the sight or sound of minor children.

The State could not locate Blount for trial. Despite her absence, the State offered into evidence a recording of her 911 call and testimony of the statements she made to the police. The State argued that the statements did not present a confrontation issue because they were nontestimonial. The court admitted both statements over the defense's objection.

At trial, Officer King testified that he arrived at the scene and saw Blount standing in the street with a neighbor. He also observed Kelich sitting down and bleeding from his head, face, and upper body. Blount began running towards the officer and seemed "hyperactive" and "freaked out." Officer King asked Blount

what had happened and "[s]he made statements of witnessing the assault. That [Wilkes] had attacked [Kelich] and that she had to intervene to get the kids out and get them to safety."

Officer Mishler also testified to statements Blount made. He too stated that Blount immediately started running towards him and Officer King when they first arrived. He said Blount was "very excited" and that she was "waving her hands" and "talking really fast." Officer Mishler asked Blount if she had seen what happened and "[s]he said she had and had seen the whole thing." He recounted, "[Blount] said that she was sitting on the back porch smoking a cigarette and she heard our victim, [Kelich] . . . inside screaming at his son and was swearing at him and then she saw [Wilkes] come into where he was and just start hitting him."

The State additionally presented expert testimony that Kelich showed symptoms that he had been strangled, including petechia.[2]

On November 20, 2017, the jury convicted Wilkes as charged. The jury also returned special verdicts finding that Wilkes and Kelich were members of the same family or household and that the assault involved aggravated domestic violence.

The court sentenced Wilkes to 55 months imprisonment on January 18, 2018. The court also imposed a $200 criminal filing fee and a $100 DNA fee.

Wilkes appeals.

---

[2] Petechia refers to "one of the minute hemorrhages or purpuric spots that appear on the skin or mucous and serous membranes or within an organ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1689 (2002).

II.
ANALYSIS

A. Confrontation Clause

Wilkes contends that the trial court admitting Blount's 911 call and her statements to the police violated his right to confrontation. The State claims the court properly admitted the statements because they were nontestimonial. We agree with the State.

We review de novo confrontation clause challenges. State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479 (2009).

Under the Sixth Amendment of the United States Constitution, criminal defendants have the right to confront the witnesses against them. U.S. CONST. amend. VI; Crawford v. Washington, 541 U.S. 36, 42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Our state constitution provides a similar right. CONST. art. I § 22; State v. Hurtado, 173 Wn. App. 592, 595, 294 P.3d 838 (2013). The right to confrontation "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" Crawford, 541 U.S. at 51. If a prosecutor seeks to admit testimonial evidence, then the Confrontation Clause requires the declarant's unavailability and a prior opportunity for cross-examination by the defendant. Crawford, 541 U.S. at 68. Nontestimonial evidence does not implicate the Confrontation Clause. Crawford, 541 U.S. at 68.

Because, in this case, neither party challenges Blount's unavailability or that Wilkes lacked a prior opportunity to cross-examine her, the admissibility of her statements turn on whether they are testimonial. See State v. Ohlson, 162

Wn.2d 1, 16, 168 P.3d 1273 (2007). When determining whether a statement is testimonial, courts look to its primary purpose:

> [S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

To decide whether an ongoing emergency exists, courts must conduct "a highly context-dependent inquiry." Michigan v. Bryant, 562 U.S. 344, 363, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). Four factors aid courts in conducting this inquiry: (1) whether the speaker described current or past events (with current events suggesting the statements are nontestimonial), (2) whether a reasonable listener would conclude that the speaker faced an ongoing emergency and needed help, (3) whether the nature of the questions asked and answered were necessary to resolve an ongoing emergency rather than learn what happened in the past, and (4) the level of formality of the interrogation (with informality suggesting the statements are nontestimonial). Koslowski, 166 Wn.2d at 418-19. The State bears the burden of establishing that statements are nontestimonial. Koslowski, 166 Wn.2d at 417 n.3.

Wilkes argues that both Blount's 911 call and her statements to the police were testimonial because no ongoing emergency existed at the time she made

them. He contends any emergency was over before Blount made the statements, because the fight had ended and those involved had separated themselves from him. We address each set of statements in turn.

1. 911 Call

The facts show that Blount's statements in the 911 call were nontestimonial because the primary purpose was to obtain help for an ongoing emergency. Applying the four factors, Blount spoke using the present tense, saying, "My best friend's father is beating up her husband." Even if her statements were made shortly after Wilkes's assault on Kelich had ended, our Supreme Court has noted that a court may consider statements made within minutes of an assault as contemporaneous with the event described. Ohlson, 162 Wn.2d at 17.

Second, a reasonable listener would believe that Blount faced an ongoing emergency. At the beginning of the call, Blount said she needed the police and an ambulance. See State v. Pugh, 167 Wn.2d 825, 832, 225 P.3d 892 (2009) (determining that a request for an ambulance in conjunction with statements that someone had been beaten indicated an ongoing emergency). During her call, Blount told the operator "we need help. We need help." After Wilkes walked outside, she said, "We just need [the police] here now. Like bad." Blount was still frantic[3] when she spoke to the police who arrived at the scene about

---

[3] Our Supreme Court in Koslowski noted that a declarant's emotional state is relevant only insofar as it relates to analyzing the four factors applied when deciding whether statements are testimonial. 166 Wn.2d at 424. Here, Blount's frantic state indicated a belief of a continuing emergency and caused the police interrogation to be informal. As such, Blount's frantic state shows she was seeking help within the meaning of Confrontation Clause case law.

14 minutes later. These facts show that Blount sought to obtain police assistance to help resolve an ongoing emergency.

At the end of the phone call, Blount told the operator that "everything is fine." Though this statement may suggest she was alright for the moment, it is not dispositive of whether an ongoing emergency existed. Instead, it constitutes but one fact to consider in the overall analysis. Given all the other facts of the phone call suggesting an ongoing emergency—namely her requests for the police and an ambulance, her pleas for help, and her frantic conduct vis-à-vis the police—we still conclude the second factor weighs in favor of her statements being nontestimonial.

As to the third factor, the operator's questions aimed to assist an ongoing emergency. The questions focused on Wilkes's identity, whether he was armed, and the extent of Kelich's injuries. See Pugh, 167 Wn.2d at 833 (noting an operator's questions indicated an ongoing emergency because they asked about the assailant's identity and whether he was armed).

Finally, the interrogation was informal. The parties asked and answered questions over the phone. Blount made the call while she was standing outside in the street, the police had not arrived yet, and her environment was not tranquil. See Davis, 547 U.S. at 827 (providing that a 911 call was informal because the interrogation occurred over the phone and "in an environment that was not tranquil"); State v. Reed, 168 Wn. App. 553, 566, 278 P.3d 203 (2012) (determining that an interrogation was informal because the declarant made the statements from an unsafe location and outside of police protection).

8

Though all four factors suggest that Blount's statements were nontestimonial, Wilkes contends no ongoing emergency existed because, Kelich, Blount, and the children had removed themselves from the house. But in domestic violence cases, courts assess the presence of an ongoing emergency based on whether a continuing threat to the victim existed. Reed, 168 Wn. App. at 567 (citing Bryant, 562 U.S. at 363). Additionally, as a domestic assailant's departure from a scene does not necessarily eliminate a potential threat, a mere separation also does not prove that an emergency has ended. See Reed, 168 Wn. App. at 567. Thus, that Wilkes was not outside with Blount while she made the 911 call does not render her statements testimonial.[4]

A 911 call "is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." Davis, 547 U.S. at 827 (changes in original). This general observation proves true here. We determine the trial court did not err by admitting Blount's 911 call.

2. Statements to Police

Wilkes next argues that Blount's statements to the police were testimonial for the same reasons as the 911 call—i.e., because the individuals had

---

[4] Wilkes likens this case to Koslowski. But that case involved a robbery by unknown assailants who had left the scene; and nothing indicated that they would return, or that any other ongoing situation or relationship with the victim existed. 166 Wn.2d at 422. In contrast, here, the officers believed Wilkes remained at the scene and did not realize he had fled until entering the home. Even if they had known Wilkes had fled, he may have returned since he lived at the house where the assault occurred. Additionally, in this domestic violence case, an ongoing relationship existed between the defendant and the victim existed. Accordingly, the Court's analysis in Koslowski does not suggest that Blount's statements, both in the 911 call and to the police, were testimonial.

9

separated from Wilkes, there was no present danger and therefore no ongoing emergency. This issue presents a closer question. Nevertheless, because the facts indicate that Blount's primary purpose in speaking to the police was to resolve an ongoing emergency, we determine that the trial court properly admitted her statements.

The record shows that the police arrived at the scene 14 minutes after Blount called 911. As soon as the officers parked their cars, Blount began running towards them, waving her arms in the air. Blount seemed "hyperactive," "freaked out," and "excited." The officers asked Blount what had happened. While "talking really fast," Blount made statements of seeing Wilkes hit Kelich. While Blount spoke to the police, Kelich was sitting on the curb, bleeding from his head, face, and upper body.

These circumstances indicate that Blount made her statements not to prove past facts, but to obtain police assistance in responding to an ongoing emergency. Blount made her statements shortly after the assault and in an informal setting. With little prompting, Blount told the officers that she had witnessed an assault. Kelich sat behind her bleeding from his injuries. The police initially believed Wilkes was inside the home. The police first to arrive were concerned for their own safety. On these facts, a reasonable listener would understand Blount's statements as an attempt to obtain police assistance to end an ongoing emergency. Again, that Wilkes was not present when Blount made the statements does not necessarily make them testimonial. See Reed, 168 Wn. App. at 567 (citing Bryant, 562 U.S. at 363). Because Blount made her

10

statements to the police in an attempt to resolve an ongoing emergency, her statements were nontestimonial and did not implicate the Confrontation Clause. We conclude the trial court properly admitted them.

B. Statement of Additional Grounds

Wilkes filed a Statement of Additional Grounds. In it, he argues that his counsel performed ineffectively by not calling an expert to counter the State's expert testimony that Kelich's petechia suggested he had been strangled. Because Wilkes cannot show that this prejudiced him, his claim fails.

A successful claim of ineffective assistance of counsel requires the petitioner to show both that their counsel performed deficiently and that the deficient performance prejudiced them. State v. Salas, 1 Wn. App. 2d 931, 949, 408 P.3d 383 (2018). To establish prejudice, there must be "a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceedings would have been different." In re Pers. Restraint of Rice, 118 Wn.2d 876, 889, 828 P.2d 1086 (1992).

Typically, "the decision whether to call a witness is a matter of legitimate trial tactics and will not support a claim of ineffective assistance of counsel." State v. Maurice, 79 Wn. App. 544, 552, 903 P.2d 514 (1995). But "depending on the nature of the charge and the issues presented, effective assistance of counsel may require the assistance of expert witnesses to test and evaluate the evidence against a defendant." State v. A.N.J., 168 Wn.2d 91, 112, 225 P.3d 956 (2010).

Assuming that the failure to call an expert on this issue constituted deficient performance, Wilkes's claim fails because he cannot show prejudice. In his Statement, Wilkes fails to establish that an expert could have testified in his favor and challenged the State's expert's assessment that Kelich had been strangled. Additionally, the Statement does not address the other bases for the expert's opinion that Kelich had been strangled—i.e., Kelich's statements that he had been strangled, bruising around his throat, and his throat being sore.

Moreover, Wilkes admitted to having a fight with Kelich. Wilkes, at 6 feet and 200 pounds, testified that he punched Kelich, who is 5 feet, 8 inches, and 144 pounds, between eight and eleven times. Kelich's injuries included a cheekbone fracture, nose fracture, contusions all over his body, and lacerations on his face and arms. Because Wilkes claimed he punched Kelich in self-defense, he would have had to show that he used reasonable force for his defense to be successful. See State v. Janes, 121 Wn.2d 220, 238-39, 850 P.2d 495 (1993)). Thus, even if an expert witness could provide testimony that strangulation did not cause Kelich's petechia, Wilkes has not demonstrated a reasonable probability that, given the facts of this case, a jury would find that he used reasonable force. Accordingly, we determine that his ineffective assistance of counsel claim fails.

C. Legal Financial Obligations

Citing State v. Ramirez, 191 Wn.2d 732, 426 P.3d 714 (2018), Wilkes argues that the $200 filing fee and $100 DNA fee should be stricken from his Judgment and Sentence. Ramirez, decided after the trial court imposed the fees

12

in this case, holds that courts may not impose discretionary costs on an indigent criminal defendant. 191 Wn.2d at 746. Here, the court recognized Wilkes's indigence when it allowed him to pursue his appeal at public expense. The DNA fee here was discretionary because Washington had previously collected his DNA as a result of a prior conviction. See Ramirez, 191 Wn.2d at 747. The filing fee was also discretionary. Ramirez, 191 Wn.2d at 748. The State agrees that fees should be stricken. We accept the State's concession.

Affirmed. Remanded to strike the filing fee and DNA fee.

_Chun, J._

WE CONCUR:

_Leach, J._                    _Appelwick, C.J._