IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 80127-9-I |
| Respondent, | |
| v. | ORDER DENYING MOTION FOR RECONSIDERATION AND WITHDRAWING AND SUBSTITUTING OPINION |
| CAMERON J. ELLIS, | |
| Appellant. | |

Cameron J. Ellis filed a motion for reconsideration of the opinion filed on July 20, 2020. Respondent State of Washington filed an answer to the motion. The panel has determined that the motion for reconsideration should be denied but the opinion filed on July 20, 2020 withdrawn and a substitute opinion filed. Now, therefore, it is hereby

ORDERED that appellant's motion for reconsideration is denied and the opinion filed on July 20, 2020 shall be withdrawn and a substitute opinion shall be filed.

_____
Bowman, J

_____
Mann, C.J.

_____
Leach, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 80127-9-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| CAMERON J. ELLIS, | |
| Appellant. | |

BOWMAN, J. — Cameron J. Ellis appeals his jury convictions for six counts of felony violation of a no-contact order and one count of robbery in the second degree. He asserts the underlying no-contact order is constitutionally invalid, the court violated his right to confrontation by admitting the victim's out-of-court statements, the State relied on inadmissible hearsay to identify the victim's phone number, and two of his convictions violate double jeopardy. He also claims and the State concedes that remand is necessary to recalculate his offender score and to strike a scrivener's error in the judgment and sentence. We conclude that Ellis is barred from collaterally challenging the validity of the underlying no-contact order, that the impermissible hearsay establishing the victim's telephone number was harmless error, and that Ellis' convictions do not violate double jeopardy. But the victim's out-of-court statements were testimonial

and violate the confrontation clause. We reverse one of Ellis' convictions and remand for further proceedings consistent with this opinion.

FACTS

On October 18, 2017, following a conviction for fourth degree domestic violence assault, the Tukwila Municipal Court (TMC) issued a five-year domestic violence no-contact order prohibiting Ellis from having any contact with B.S. "directly" or "indirectly" or being within 500 feet of her. Ellis signed and acknowledged receipt of a copy of the TMC no-contact order. Yet Ellis continued to contact B.S. By January 8, 2018, Ellis had two municipal court convictions for misdemeanor violation of the TMC no-contact order.

On January 28, 2018, a bystander called 911 from a Denny's restaurant and reported that "[a] lady" just came in "freaking out," saying she "needs a police officer here at Denny's." The "lady," later identified as B.S., declined to talk to the 911 operator. But during the 911 call, B.S. can be heard in the background stating, "Somebody hit me . . . [a]nd he took my car," a black Nissan Sentra. B.S. also confirmed that "a boyfriend" hit her but she did not identify herself or disclose the boyfriend's name.

Within five minutes of the 911 call, King County Sheriff Deputy Matthew Chapman arrived at the Denny's. Once on scene, Deputy Chapman saw "Mr. Smith" exiting a black Nissan Sentra in the Denny's parking lot. He talked to Smith for "a minute or two." Smith said he "found the vehicle in the road against the median" and saw "a female run in the Denny's." Smith then "moved" the

Nissan "back to the parking lot" for her. Deputy Chapman confirmed Smith's identity and "released him from the area."[1]

Deputy Chapman saw a "visibly distraught" and "kind of frantic" B.S. come out of Denny's. Deputy Chapman spoke to B.S. for 5 to 10 minutes. B.S. confirmed ownership of the Nissan while "speaking very quickly, very upset." B.S. told Deputy Chapman that

> she had gotten in her — just unlocked her vehicle, got in her vehicle to leave the parking lot. At that point, she realized that Mr. Ellis was in the vehicle with her. She said she then told him that he couldn't be there because they had a protection order which prohibited them from contacting each other. She said at that point, he then punched her in the right side of the face. And then she jumped out of the vehicle while it was still moving, which is how it ended up in the median.

B.S. gave a detailed description of Ellis. Other deputies who responded to the 911 call conducted "an area check" but none of them found Ellis. Deputies photographed the Nissan and the injuries to B.S.'s right eye, which included redness, swelling, and a "contusion" above her eyebrow "consistent with being punched in the face."

On March 17, 2018, Terri Drake called 911 and reported that "[t]his guy is beating on this girl in the parking lot at Crystal Manor Apartments." Drake said, "His name is Cameron Ellis" and identified B.S. as the victim. Drake told the 911 operator that Ellis beat up B.S. "until she jumped in my car" and that B.S.'s car "is unattended right now. And the door is open." Drake said, "[H]e's got [B.S.'s] purse" and, "I think he's walking behind us now." Drake reported that Ellis had "a no-contact . . . too."

---

[1] Neither Smith nor the 911 caller testified at trial.

3

Deputy Chapman responded to the 911 call and arrived at the apartment complex within six minutes. Upon his arrival, a "visibly distraught" and "very elevated" B.S. waved down Deputy Chapman. B.S. told the deputy she drove to the apartments to meet her friend Drake and saw Ellis in the parking lot when she got out of her car. Ellis tried to call B.S. over to him. Instead, B.S. backed away and got inside Drake's vehicle. Ellis opened Drake's car door and B.S. kicked at Ellis "to fend him off." Ellis then tried grabbing B.S.'s purse and began punching her in the face, head, and upper body area. At that point, B.S. released the purse and Ellis walked away. As Drake drove away "from the situation," B.S. saw Ellis take the wallet out of her purse and throw the purse into her Nissan. B.S. gave Deputy Chapman a description of Ellis but deputies did not find him.

The State charged Ellis with two counts of domestic violence felony violation of the TMC no-contact order and one count of second degree robbery of B.S.'s purse. Ellis remained in custody awaiting trial.

While in custody, the jail recorded four telephone calls from Ellis to B.S.'s cell phone number 206-437-XXXX.[2] Ellis made the first call on April 9, 2018 at 12:35 p.m. from his jail booking account (BA) number. He made the second call from his BA number on April 9, 2018 at 12:52 p.m. Ellis made the third call on April 11, 2018 at 8:55 p.m. from his jail housing unit but from a BA number belonging to "Clarence Darden." And he made the last call on May 14, 2018 at 9:03 a.m. from his BA number. Neither Ellis nor B.S. identified themselves in any of the calls. After listening to the jail calls, the State amended the information to

---

[2] We redact the last four digits of phone numbers throughout this opinion to protect the victim's privacy.

charge Ellis with four additional counts of domestic violence felony violation of the 2017 TMC no-contact order.

During pretrial motions, the court denied Ellis' motion to exclude the TMC no-contact order. The court also overruled Ellis' hearsay objection to the State eliciting testimony from Deputy Chapman about B.S.'s March 17, 2018 statements to him and reserved ruling on her January 28, 2018 statements to the deputy.

At trial, B.S. did not testify. Ellis renewed his objections to the State's use of B.S.'s statements to Deputy Chapman but the court overruled them. King County jail captain Michael Allen confirmed Ellis' BA number and testified about the four recorded jail calls to 206-437-XXXX. The State also played each jail call for the jury and provided a transcript as a listening aid. Over Ellis' hearsay objections, King County Sheriff Detective Benjamin Wheeler read from a report that listed B.S.'s "cell phone number" as 206-437-XXXX.

Defense private investigator Verla Viera testified to meeting B.S. in person and B.S. stating that Ellis had not assaulted her or taken her purse. On cross-examination, Viera said the phone number in her file for B.S. was 206-437-XXXX. Ellis did not testify at trial.

In closing, the State used a Microsoft PowerPoint slide show to show the jury the dates and times of all four jail calls Ellis made to B.S.'s cell phone number. The jury convicted Ellis of the charged offenses but did not find there was a domestic relationship between B.S. and Ellis. The court imposed a

concurrent standard-range sentence of 60 months' confinement. Ellis timely appeals.

## ANALYSIS

<u>Validity of TMC No-Contact Order</u>

The State charged Ellis with six felony violations of the TMC no-contact order that issued following his conviction for fourth degree assault. Ellis argues that his underlying assault conviction is constitutionally invalid so the TMC no-contact order is also invalid. The State argues Ellis is collaterally barred from challenging the validity of the TMC no-contact order. We agree with the State.

Before trial, Ellis moved to exclude the TMC no-contact order, arguing that it stemmed from an invalid assault conviction. Ellis claimed the conviction was invalid because he pleaded guilty without counsel and without evidence of a valid waiver of counsel.[3] In support of his argument, Ellis relied on the TMC docket that only noted (1) counsel initially represented Ellis, (2) Ellis then elected to proceed pro se, (3) the matter was set aside for Ellis to "speak with the prosecutor," (4) a "[w]aiver of right to counsel [was] approved and signed" by the court, and (5) the plea of guilty was "filed and accepted." The trial court denied Ellis' motion.

---

[3] A valid waiver of counsel requires a showing in the record that the defendant understands the nature and classification of the charge, the maximum penalty of a conviction, and the existence of binding technical rules that govern presentation of a defense. <u>State v. Howard</u>, 1 Wn. App. 2d 420, 426-27, 405 P.3d 1039 (2017).

The collateral-bar rule "prohibits a party from challenging the validity of a court order in a proceeding for violation of that order."[4] City of Seattle v. May, 171 Wn.2d 847, 852, 256 P.3d 1161 (2011) (citing State v. Noah, 103 Wn. App. 29, 46, 9 P.3d 858 (2000)).  Exceptions exist for void or inapplicable orders. May, 171 Wn.2d at 852, 854-55.  An order is void if the issuing court lacks jurisdiction over the parties or the subject matter or if the court lacks the inherent power to enter the order.  Bresolin v. Morris, 86 Wn.2d 241, 245, 543 P.2d 325 (1975).

Ellis does not allege that the court lacked jurisdiction or the inherent power to issue the TMC no-contact order.  Nor does he argue that the order does not apply to him.  Instead, he argues that the no-contact order was invalid because the underlying conviction was constitutionally infirm.  The collateral-bar rule prohibits his challenge.

Right to Confrontation

Ellis claims the trial court's admission of B.S.'s statements to Deputy Chapman violated his right to confrontation.  The State contends the court properly admitted B.S.'s statements because they were nontestimonial.  We review a confrontation clause challenge de novo.  State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479 (2009).

---

[4] This rule "recognize[s] that flaws which do not go to the heart of the judicial power are insufficient to justify the flaunting of an otherwise lawful order."  Mead Sch. Dist. No. 354 v. Mead Educ. Ass'n, 85 Wn.2d 278, 284, 534 P.2d 561 (1975).  And that a party's remedy for an erroneous order or decision is to appeal it, not to disregard it contemptuously.  Deskins v. Waldt, 81 Wn.2d 1, 5, 499 P.2d 206 (1972) (citing Dike v. Dike, 75 Wn.2d 1, 8, 448 P.2d 490 (1968)).

The Sixth Amendment to the United States Constitution provides that criminal defendants shall have the right to confront the witnesses against them. Crawford v. Washington, 541 U.S. 36, 42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The confrontation clause bars admission of testimonial statements of a witness who does not appear at trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. Crawford, 541 U.S. at 68. The State bears the burden of establishing that statements are nontestimonial. Koslowski, 166 Wn.2d at 417 n.3.

In determining whether a statement is testimonial, courts look to its primary purpose:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

In Koslowski, the Washington Supreme Court focused on four factors discussed in Davis to help determine whether the primary purpose of a law enforcement interrogation "is to enable police assistance to meet an ongoing emergency or instead to establish or prove past events":

> (1) Was the speaker speaking about current events as they were actually occurring, requiring police assistance, or was he or she describing past events? The amount of time that has elapsed (if any) is relevant. (2) Would a "reasonable listener" conclude that the speaker was facing an ongoing emergency that required help?

> A plain call for help against a bona fide physical threat is a clear example where a reasonable listener would recognize that the speaker was facing such an emergency. (3) What was the nature of what was asked and answered? Do the questions and answers show, when viewed objectively, that the elicited statements were necessary to resolve the present emergency or do they show, instead, what had happened in the past? For example, a 911 operator's effort to establish the identity of an assailant's name so that officers might know whether they would be encountering a violent felon would indicate the elicited statements were nontestimonial. (4) What was the level of formality of the interrogation? The greater the formality, the more likely the statement was testimonial. For example, was the caller frantic and in an environment that was not tranquil or safe?

Koslowski, 166 Wn.2d at 418-19[5] (quoting Davis, 547 U.S. at 827).

The court also recognized that "a conversation could contain both testimonial and nontestimonial statements," which may begin with inquiries to address an emergency and later "become testimonial once the emergency appears to have ended or the information necessary to meet the emergency has been obtained." Koslowski, 166 Wn.2d at 419 (citing Davis, 547 U.S. at 828). And with domestic disputes, officers will often "need to determine with whom they are dealing in order 'to assess the situation, the threat to their own safety, and possible danger to the potential victim.' " Koslowski, 166 Wn.2d at 421[6] (quoting Davis, 547 U.S. at 832).

Ellis argues that B.S.'s January and March 2018 statements to Deputy Chapman were testimonial because the statements were "about the completed incidents."[7] We address each statement in turn.

---

[5] Footnote omitted.

[6] Internal quotation marks omitted.

[7] The trial court admitted the 911 calls for the January and March 2018 incidents. Ellis concedes that "[t]hese calls are not testimonial under the confrontation clause."

9

I. January 2018 Statements

The record shows that B.S.'s January 28, 2018 statements to Deputy Chapman were testimonial because the primary purpose of the interrogation was not to aid an ongoing emergency.

Deputy Chapman testified that he spoke with B.S. for approximately 10 minutes while he was at the scene. The questioning focused on eliciting from B.S. the details of what happened. Deputy Chapman testified B.S. told him that she "unlocked her vehicle" and "realized that Mr. Ellis was in the vehicle with her." According to Deputy Chapman, B.S. told Ellis that "he couldn't be there" because of the no-contact order. Then Ellis punched her and she "jumped out of the vehicle while it was still moving." Deputy Chapman testified, "[F]rom there, she ran into the Denny's" and a bystander called 911. B.S. gave Deputy Chapman a detailed description of Ellis, including what he was wearing, and denied needing medical attention. Deputy Chapman testified that B.S. did not provide "any sort of written statement" and that he did not "ever try to follow up with her."

A reasonable listener would not believe that the primary purpose of Deputy Chapman's questioning was to meet an ongoing emergency. B.S. had recovered her car and the scene was secure. Although deputies did not locate Ellis in the area, there was no evidence to suggest that he posed "a threat of harm, thereby contributing to an ongoing emergency." State v. Ohlson, 162 Wn.2d 1, 15, 168 P.3d 1273 (2007). There was no indication that he possessed a weapon or tried to return to the scene. And Deputy Chapman testified that B.S.

"did not want any medical attention," and that she was "insisting that she had to go pick up her child and that she had to leave right away because she had to pick them up."

Neither were B.S.'s statements primarily the type necessary to resolve an ongoing emergency. Rather, they were responses to Deputy Chapman's questioning about what happened and whether she needed medical attention. These questions, when viewed objectively, primarily elicited statements that described events that happened in the past and were potentially relevant to a subsequent prosecution.

Finally, although B.S.'s conversation occurred in the informal setting of a Denny's parking lot, the environment was secure with the deputies present. We conclude that B.S.'s January 28 statements were testimonial and that admitting the statements through Deputy Chapman violated Ellis' Sixth Amendment right to confront witnesses.

Constitutional error is presumed prejudicial. State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). However, confrontation clause violations are subject to a harmless error analysis. State v. Fisher, 185 Wn.2d 836, 847, 374 P.3d 1185 (2016). A constitutional error is harmless if the appellate court is "persuaded beyond a reasonable doubt that the jury would have reached the same result in absence of the error." Fisher, 185 Wn.2d at 847. In determining whether constitutional error is harmless, we consider "whether the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt." Fisher, 185 Wn.2d at 847.

Here, the untainted evidence does not persuade us beyond a reasonable doubt that a jury would find Ellis guilty of the January 28 felony violation of the TMC no-contact order. Deputy Chapman was the sole witness in support of the allegation. And although the court admitted the 911 call containing the bystander's statements, the caller does not provide the identity of either Ellis or B.S., nor does the substance of the call amount to overwhelming evidence that Ellis committed felony violation of a no-contact order. For these reasons, we conclude the confrontation clause error was not harmless and reverse the conviction as charged in count 1.

II.  March 2018 Statements

Ellis next argues that B.S.'s statements to Deputy Chapman on March 17, 2018 were testimonial for the same reasons as her January 28 statements—there was no ongoing emergency and B.S. told the deputy about "completed incidents."

On March 17, Deputy Chapman arrived at the apartment complex within six minutes of Drake's call to 911. B.S. "flagged" down the deputy and seemed "distraught" and "very elevated." B.S. then told Deputy Chapman what happened. She explained that Ellis "punched her multiple times" in the face and upper body area and "took" her purse "as he walked away." On these facts, a reasonable listener would interpret B.S.'s statements as an attempt to report a past event rather than aid in an ongoing emergency. Again, Ellis had left the area and there is no indication that he posed an ongoing threat to B.S. or to the public at large. And while Deputy Chapman's interrogation took place in an

informal setting, the setting was again formal enough that B.S. could deliberately recount the events in response to questioning in a secure environment. Based on the record before us, we conclude that B.S.'s March 17, 2018 statements are testimonial and that their admission at trial violated the confrontation clause.

But we conclude the jury would have reached the same result without the error. Fisher, 185 Wn.2d at 847. Here, the overwhelming untainted evidence supports the jury finding Ellis guilty of robbery in the second degree and felony violation of the TMC no-contact order on March 17, 2018. The court admitted as evidence a certified copy of the TMC no-contact order as well as the 911 call Drake made requesting help just after the incident. The 911 call established that "Cameron Ellis" was "beating" a woman "in the parking lot at Crystal Manor Apartments," that he took her purse, and that the woman's name is "[B.S.]."[8] Drake testified at trial and read to the jury the written statement she gave Deputy Chapman on March 22, 2018:

> "[B.S.] . . . is a friend of mine. And I've known Cameron Ellis as her previous boyfriend. On 3/17/18, about 4:45 p.m., I was arriving to pick up [B.S.] at the Crystal Manor Apartments . . . . I saw [B.S.] and [Ellis] standing [n]ear her car. . . .
> "When I stopped, [B.S.] tried to leave [Ellis] and get into my car. [Ellis] then started grabbing and pulling on [B.S.] to stop her from leaving. He then started pulling on her purse and punching her repeatedly. She finally let go, and [Ellis] walked away with the purse.

Given this evidence, we conclude beyond a reasonable doubt that any confrontation clause error related to B.S.'s March 2018 statements was harmless.

---

[8] Drake provided B.S.'s full first and last name.

13

Hearsay Evidence

Ellis next argues that Detective Wheeler's testimony about B.S.'s phone numbers was inadmissible hearsay. We agree.

We review evidentiary rulings for abuse of discretion. State v. Dobbs, 180 Wn.2d 1, 10, 320 P.3d 705 (2014). A trial court abuses its discretion when a decision is manifestly unreasonable or based on untenable grounds or reasons. Dobbs, 180 Wn.2d at 10. "Hearsay" is a statement "other than one made by the declarant while testifying at the trial, offered in evidence to prove the truth of the matter asserted." ER 801(c). Unless an exception applies, hearsay is inadmissible. ER 802; State v. Athan, 160 Wn.2d 354, 382, 158 P.3d 27 (2007).

At trial, Detective Wheeler testified as follows:

Q       And do you recall the numbers that you called to try and attempt to reach [B.S.]?
A       Not the specific numbers, but one was provided as a home number and the other as either cell phone or work number.
Q       Okay. And are those — is that information that would be contained in your report or other officers' reports or — I mean, can you tell us the —
A       It would be in the reporting officer's report and quite possibly in my own as well.
Q       Okay. So do you remember — did you ever speak with [Detective] Chapman, the reporting officer in this case?
A       I spoke with him many times. I don't remember if we talked about this.
Q       Okay. But so — but when you're investigating a case, you would go back and review what he had written down, his notes, his report even as part of this investigation; is that correct?
A       Yes.
Q       All right. I am going to show you what has been marked State's Exhibit 17 and 18. Do those look familiar?
A       These are two reports covering two different incidents, both written by [Detective] Chapman.
Q       All right. And this is part of the case that you investigated against Mr. Ellis; is that correct?
A       I believe the second one was, the one from March.

14

> Q        Okay.  The second one was in March.  So as part of that case — or, well, does looking at that report help refresh your recollection about the numbers called or that you attempted to use to call [B.S.]?
> A        Yes.  They're listed right here in the report.
> Q        All right.  And what are the numbers that you tried to call?
>                 [DEFENSE COUNSEL]:    Objection; hearsay.
>                 THE COURT:    I'm going to overrule the objection.
>                 [DETECTIVE WHEELER]:    <u>253-735-[XXXX] was given as her home address and the cell phone number 206-437-[XXXX]</u>.[9]

A party may use a writing to "refresh" the memory of a witness.  ER 612.  But police reports are a subjective summary of the officer's investigation and are generally not admissible.  In re Det. of Coe, 175 Wn.2d 482, 505, 286 P.3d 29 (2012) (citing State v. Hines, 87 Wn. App. 98, 101-02, 941 P.2d 9 (1997)).  Moreover, the victim and witness statements that make up the reports are "an additional level of hearsay," and when "multiple levels of hearsay are involved, each level must meet an exception."  Coe, 175 Wn.2d at 505 (citing ER 805).

Here, Detective Wheeler could properly refer to Deputy Chapman's report as a writing to refresh his memory as to the specific numbers that he dialed when trying to reach B.S.  But he also testified that Deputy Chapman's report indicated each number "was given" as B.S.'s home and cell phone numbers.  The detective's testimony identifying the phone numbers as belonging to B.S. is hearsay and the trial court erred by admitting it.

The erroneous admission of hearsay is harmless error unless within reasonable probability, the improper evidence affected the outcome of the trial.  State v. Thomas, 150 Wn.2d 821, 871, 83 P.3d 970 (2004).  Following Detective

---

[9] Emphasis added.

Wheeler's testimony, the State cross-examined defense investigator Viera about her contact and communication with B.S. Viera testified without objection that 206-437-XXXX was "the only phone number" she had on file for B.S. We conclude the outcome at trial would not have been different in the absence of Detective Wheeler's inadmissible hearsay testimony.

<u>Double Jeopardy</u>

Ellis claims that two of his convictions for felony violation of the TMC no-contact order as charged in counts 4 and 5 violate double jeopardy. We disagree.

The Fifth Amendment to the United States Constitution and article 1, section 9 of the Washington Constitution protect a defendant from multiple punishments for the same offense. <u>State v. Mutch</u>, 171 Wn.2d 646, 661, 254 P.3d 803 (2011). "A 'defendant's double jeopardy rights are violated if he or she is convicted of offenses that are identical both in fact and in law.' " <u>State v. Peña Fuentes</u>, 179 Wn.2d 808, 824, 318 P.3d 257 (2014) (quoting <u>State v. Calle</u>, 125 Wn.2d 769, 777, 888 P.2d 155 (1995)). A defendant may raise a double jeopardy claim for the first time on appeal, and we review the claim de novo. <u>Mutch</u>, 171 Wn.2d at 661.

When a person is charged with multiple counts of the same offense, "each count must be based on a separate and distinct criminal act." <u>Mutch</u>, 171 Wn.2d at 662. Ellis argues that "the record contains no guarantee" that the jurors unanimously agreed that he committed separate and distinct violations of the TMC no-contact order on April 9, 2018. The State alleged in counts 4 and 5 that

16

Ellis called B.S. from jail on April 9, but the trial court did not instruct the jury that each count must stem from separate criminal acts. And the court's to-convict instructions for both counts were identical:

> To convict the defendant of the crime of felony violation of a court order as charged in Count IV [and V], each of the following five elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about April 9, 2018, there existed a no-contact order applicable to the defendant;
> (2) That the defendant knew of the existence of this order;
> (3) That on or about said date, the defendant knowingly violated a provision of this order;
> (4) That at the time of the violation, the defendant had twice been previously convicted for violating the provisions of a court order; and
> (5) That the defendant's act occurred in the State of Washington.
>
> If you find from the evidence that elements (1), (2), (3), (4) and (5), have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty as to Count IV [and V].
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of the five elements, then it will be your duty to return a verdict of not guilty as to Count IV [and V].

We agree with Ellis that the court's instructions were flawed. But flawed instructions create only the potential for a double jeopardy violation. Mutch, 171 Wn.2d at 663. Double jeopardy is not violated when review of the entire record, evidence, arguments, and instructions show that it is " 'manifestly apparent to the jury that the State [was] not seeking to impose multiple punishments for the same offense' and that each count was based on a separate act." Mutch, 171 Wn.2d at 664[10] (quoting State v. Berg, 147 Wn. App. 923, 931, 198 P.3d 529 (2008)).

---

[10] Alteration in original.

Here, the State charged Ellis with six distinct counts of violating the TMC no-contact order and the court gave the jury six separate to-convict instructions. Throughout the trial, the State made clear that the two April 9 counts stemmed from separate acts. During its case-in-chief, the State played both April 9 jail calls for the jury and provided transcripts as listening aids. The State marked those transcripts for illustrative purposes as exhibits 29 and 31. Exhibit 29 is identified as "TRANSCRIPT OF JAIL CALL #1 ON 04/09/2018 @ 12:35 TO (206)[ ]437-[XXXX]." Exhibit 31 is identified as "TRANSCRIPT OF JAIL CALL #2 ON 04/09/2018 @ 12:52 TO (206) 437-[XXXX]." And in closing, the State used a PowerPoint presentation to illustrate and explain that "the jail phone calls that we talked about, jail calls number 1, 2, 10, and 126 that . . . are starred there on the screen, those were all calls made to [B.S.]."[11]

Based on the entire record, we conclude it was manifestly apparent to the jury that the two charges for felony violation of a no-contact order on April 9 as alleged in counts 4 and 5 were not based on a single offense. The convictions do not violate the double jeopardy clause.

<u>Domestic Violence Designation</u>

Ellis claims we should amend his judgment and sentence to remove the erroneous "domestic violence" designations listed on all of his felony violation convictions.[12] The State does not oppose this request.

---

[11] The calls "starred" in the State's PowerPoint presentation show that Ellis made jail call number 1 on "04-09-2018" at "12:35:02," jail call number 2 on "04-09-2018" at "12:52:53," jail call number 10 on "04-11-2018" at "20:55:47," and jail call number 126 on "05-14-2018" at "9:03:48."

[12] An offense may be designated as a crime of "domestic violence" if the defendant and victim are members of the same family or household. RCW 10.99.020(5).

The court's special verdict forms asked the jury to determine whether Ellis and B.S. were "members of the same family or household prior to or at the time" Ellis committed each felony violation offense. The jury found Ellis guilty of the felony violation charges but wrote "not used" on the special verdict forms and left them blank. Because the jury did not find Ellis' offenses were crimes of domestic violence, we conclude inclusion of this designation in his judgment and sentence was a scrivener's error.

The remedy for scrivener's errors in a judgment and sentence is to remand to the trial court for correction. State v. Coombes, 191 Wn. App. 241, 255, 361 P.3d 270 (2015). Thus, we remand with directions to strike the domestic violence designations from Ellis' judgment and sentence.

Criminal History and Offender Score

Ellis argues that he is entitled to a new sentencing hearing because he did not agree to the State's summary of his criminal history and the State failed to prove his offender score. The State admits it did not prove Ellis' criminal history and "concedes that this case should be remanded for resentencing." We accept the State's concession.

"In calculating [an] offender score, the State must prove the [defendant's] criminal history by a preponderance of the evidence." State v. Cate, 194 Wn.2d 909, 912-13, 453 P.3d 990 (2019) (citing State v. Hunley, 175 Wn.2d 901, 909-10, 287 P.3d 584 (2012)). Neither a "prosecutor's unsupported summary of criminal history" nor a defendant's failure to "object to the offender score calculation" satisfy the State's burden. Cate, 194 Wn.2d at 913. There "must be

19

some <u>affirmative</u> acknowledgment of the facts and information alleged at sentencing in order to relieve the State of its evidentiary obligations." <u>Hunley</u>, 175 Wn.2d at 912 (citing <u>State v. Ford</u>, 137 Wn.2d 472, 482-83, 973 P.2d 452 (1999)). We remand to the trial court for a new sentencing hearing where the State must prove Ellis' criminal history by a preponderance of the evidence.

In sum, we affirm the jury's verdict but reverse the conviction for felony violation of a court order as charged in count 1, and remand for a new sentencing hearing to strike the domestic violence designations in the judgment and sentence and for the State to prove Ellis' criminal history.

_Brennan, J._

WE CONCUR:

_Mann, C.J._                    _Leach, J._