IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37346-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| NIKOLAY IVANOVICH KALACHIK, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Nikolay Kalachik appeals his conviction for first degree rape. He argues the admission of his nontestifying accuser's statements to a police officer and a sexual assault nurse examiner (SANE) violated his state and federal constitutional rights to confront his accuser. He also argues the trial court abused its discretion by admitting these hearsay statements under the rules of evidence.

We conclude that the trial court abused its discretion by applying the wrong legal standard for the medical treatment hearsay exception and the statements through the nurse were inadmissible. We also conclude that the admission of the accuser's statements

through the police officer violated Kalachik's constitutional right to confront his accuser.

Because these errors were not harmless, we vacate Kalachik's conviction and remand.

FACTS

Around 7:30 a.m. on April 20, 2018, a young woman approached a courthouse security officer in Vancouver, Washington, said she had been raped and kicked out of a car, and asked for a deputy sheriff. The courthouse deputies were not on duty until 8:00 a.m., so the security officer called 911.

Officer Suvada[1]

Officer Kendrick Suvada of the Vancouver Police Department responded to the call. He approached the woman, who we refer to by her initials as S.B. Officer Suvada asked her if she was injured, and she said she was not. S.B. spoke very rapidly in an excited and disorganized fashion. She told Officer Suvada she was taken to a place past the Vancouver Port and raped by a man named Nikolay. He told her to get in the back seat and he got on top of her to have sex. When he finished, he grabbed some wipes and told her to clean up. She discarded the wipes outside of the car.

---

[1] The facts in this section are those considered by the trial court when deciding whether to allow Officer Suvada to testify about what S.B. told him.

Officer Suvada asked questions about Nikolay. S.B. described him as a white Russian man, really tall and big with black hair. S.B. gave Officer Suvada the telephone number she had for Nikolay. Law enforcement later determined the phone number belonged to Nikolay Kalachik.

S.B. showed Officer Suvada her hands and said her fingernails had broken off and were probably in Nikolay's car. Officer Suvada took a picture of her hands. He then discussed the case with a detective, including where to find the discarded wipes.

Officer Suvada asked S.B. if she was willing to participate in a "rape exam." Report of Proceedings (RP) at 101. She answered yes. An ambulance drove S.B. to the hospital, and Officer Suvada followed. They arrived at the hospital around 8:30 a.m.

Once there, Officer Suvada asked S.B. additional questions while they waited two hours for the forensic nurse. By this time, S.B. had calmed down and her answers to Officer Suvada's questions were organized and rational. Despite being there for two hours, S.B. did not seek or receive any medical treatment from hospital staff.

During this delay, S.B. repeatedly told Officer Suvada she wanted to leave the hospital because she was afraid her roommates would find out she was cooperating with law enforcement. She said it was taking too long and she was worried Nikolay would find out she was reporting him, but she knew she needed to do it. Officer Suvada

3

encouraged her to be patient and told her that they were trying to get the nurse there from

Portland as soon as possible.

Nurse Stern[2]

Around 10:30 a.m., SANE Cynthia Stern began S.B.'s exam. Nurse Stern works

for an agency that contracts with different area emergency departments to perform sexual

assault exams. When performing such exams, she obtains a patient history, which

includes asking what happened. This guides her exam in terms of looking for physical

injuries. In addition, she offers patients medication for sexually transmitted infections

and emergency contraception.

S.B. thoroughly described the assault to Nurse Stern. S.B. told the nurse she got

into Nikolay's car at 5:45 that morning and he drove to the Port of Vancouver. During

this drive, he threatened to shoot or kill her, and he had her perform oral sex on him. He

then parked the car and got on top of her. She tried to protect and cover herself, but she

could not because he was too big. She did not know if Nikolay had ejaculated inside her.

Nurse Stern asked S.B. if Nikolay had threatened her. S.B. said Nikolay made a gesture

indicating he had a gun and he threatened to shoot her and blow her brains out. As she

---

[2] The facts in this section are those considered by the trial court when deciding
whether to allow Nurse Stern to testify about what S.B. told her.

described what happened, S.B. would cry at times and then calm down.

Nurse Stern saw a bruise on S.B.'s right thigh and an abrasion on her left thigh. She swabbed S.B.'s vagina for suspect deoxyribonucleic acid (DNA) and noticed some blood on the swab. S.B. said she had noticed some bleeding when she wiped herself immediately after the assault.

That afternoon, Nurse Stern completed a 15-page report and submitted it to the Vancouver Police Department. This report contained: (1) a detailed report of the incident —including whether threats or force was used, and extensive quotes by S.B. describing the assault, (2) information about where the assault occurred and the identity of the assailant, (3) a detailed head-to-toe physical examination of S.B., (4) a description of evidence collected (leggings, tank top, and forensic swabs), and (5) on the last page, a section where a law enforcement officer could sign to signify who received the evidence and at what time.

Police found wipes at the scene of the crime that tested positive for Kalachik's DNA. Kalachik's DNA was also present on the swabs collected by Nurse Stern.

When police went to find Kalachik, they located him at his apartment. Police set up a perimeter and used a loud speaker to call out to him. Kalachik ran out the back door,

5

but when he saw police, he turned and jumped a fence to get back into his apartment. He

soon after gave himself up. Police found a B.B. gun in the trunk of Kalachik's car.

<u>Case procedure</u>

The State charged Kalachik with rape in the first degree and rape in the second

degree. As the trial date approached, the State was unable to locate S.B. It therefore filed

a motion to admit testimony from Officer Suvada and Nurse Stern about what S.B. had

told them.

The State argued S.B.'s statements to Officer Suvada were admissible hearsay

under the excited utterance exception, ER 803(a)(2), and did not violate the Sixth

Amendment to the United States Constitution because the primary purpose for obtaining

the information was to resolve an ongoing emergency. Kalachik disputed both

arguments.

The trial court mostly granted the State's motion with respect to Officer Suvada,

but excluded the statements S.B. made to him at the hospital. The trial court reasoned, by

the time S.B. spoke with Officer Suvada at the hospital, she no longer was emotional, and

she was conveying information in a very understandable fashion.

The State argued S.B.'s statements to Nurse Stern were admissible hearsay under

the medical treatment exception, ER 803(a)(4), and did not violate the Sixth Amendment

because statements to healthcare providers typically are not testimonial. Kalachik responded that there was no evidence that S.B. went to the hospital to obtain medical treatment, so ER 803(a)(4) did not apply. He also argued the primary purpose of the sexual assault exam was to obtain evidence for the State, not to provide medical treatment, so admission of S.B.'s statements to Nurse Stern violated the confrontation clause.

The trial court agreed with the State. With respect to the confrontation clause, it found the primary purpose of the sexual assault exam was to obtain medical treatment, and concluded statements for medical treatment generally are not testimonial statements. With respect to the medical treatment hearsay exception, it found the primary purpose for Nurse Stern's questions and S.B.'s statements was for medical treatment. With respect to the excited utterance hearsay exception, it found S.B.'s recounting of the events to Nurse Stern caused S.B. to reenter a shocked state, so her statements were excited utterances. It therefore ruled that S.B.'s statements to Nurse Stern were admissible.

The State never did locate S.B. At trial, the State called Officer Suvada and Nurse Stern to testify about what S.B. had told them. Kalachik testified in his defense.

7

*Kalachik's testimony*

Kalachik and S.B. first met in early April 2018, after S.B. moved in with one of his friends. That evening, after the three drank beer and drove to Oregon for cigarettes, Kalachik and S.B. decided to continue the night by getting more drinks and driving to Janzen Beach. The two had sex on an unoccupied boat, after which he dropped S.B. off at the home of her friend, Victor. They met the following day, picked up drinks and went to a park. They were intimate at the park, but did not have sexual intercourse.

Two weeks later, on April 20, Kalachik went to S.B's home around 5:30 a.m. Kalachik's friend was sleeping, but S.B. was awake, so the two went outside to smoke cigarettes. They got in his car, and Kalachik started to drive to Victor's house, but S.B. did not want to go there and she began to touch him. He drove toward the same park where they had been intimate, but stopped the car on the side of the road because the park was not yet open. S.B. performed oral sex on him and pulled down her pants for him to get on top of her. As they began to have sex, he felt she was acting strangely, pulling him toward her while also trying to use her shirt to cover her genitalia. Kalachik thought he saw a rash on her genitalia, pulled out and ejaculated on her shirt. They both cleaned themselves with wet wipes, which he told her to throw out the window.

Kalachik described how he immediately became scared and angry that S.B. might have a sexually transmitted infection that she tried to hide from him. The two began to fight as he drove, and he eventually told her to get out of the car. At the time, they were about a mile and one-half from the courthouse.

*Closing arguments and verdict*

After both sides presented their evidence, the trial court instructed the jury. One instruction defined "consent." Clerk's Papers at 119. During closing, the deputy prosecutor argued Kalachik did not have consent because he was threatening S.B. with physical violence. The deputy prosecutor continued:

> But you really don't even get there because consent or proving lack of consent is not an element to rape in the first degree, and it is not an element to rape in the second degree.
> You won't see on those to convict sheets that I have to prove she did not consent. The reason for that is somebody cannot consent once they've been threatened. Once fear is in the room, there can be no consent. So with that instruction, I mean, again she did not freely give consent, but other than that, there's nowhere to apply that instruction in the elements because we do not have to prove that she didn't consent.

RP at 828. Kalachik did not object to this argument.

The jury found Kalachik guilty of both rape in the first degree and rape in the second degree. At sentencing, the trial court vacated the lesser verdict and imposed a standard range sentence. Kalachik timely appealed.

*Appellate proceedings*

This court stayed Kalachik's appeal pending a decision and mandate by the

Washington Supreme Court in *State v. Burke*, 196 Wn.2d 712, 478 P.3d 1096 (2021).

Following that decision, this court lifted the stay and granted the parties permission to file

supplemental briefing addressing *Burke*.

ANALYSIS

Kalachik argues the admission of S.B.'s statements to Officer Suvada and Nurse

Stern violated his constitutional right to confront witnesses under the Sixth Amendment

to the United States Constitution and article I, section 22 of the Washington State

Constitution. He also argues the trial court committed evidentiary error when it admitted

the statements. Kalachik also argues the deputy prosecutor committed flagrant and ill-

intentioned misconduct when she informed the jury the State was not required to prove

lack of consent.

A.    EVIDENTIARY ERROR CLAIMS

Kalachik contends the trial court erred by allowing Officer Suvada and Nurse

Stern to testify about what S.B. told them. He argues S.B.'s statements to both witnesses

were not admissible under ER 803(a)(2), the hearsay exception for excited utterances. He

also argues S.B.'s statements to Nurse Stern were not admissible under ER 803(a)(4), the hearsay exception for statements for medical treatment.

This court reviews a trial court's evidentiary rulings for abuse of discretion. *State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). Abuse of discretion is found only when the decision is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *State v. McCormick*, 166 Wn.2d 689, 706, 213 P.3d 32 (2009) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). "Untenable reasons include errors of law." *Cook v. Tarbert Logging, Inc.*, 190 Wn. App. 448, 461, 360 P.3d 855 (2015).

> 1.   *S.B.'s first statements to Officer Suvada were admissible under ER 803(a)(2)*

Hearsay evidence is generally inadmissible. ER 802. But ER 803(a) contains various exceptions to this rule, based on the premise that evidence within those exceptions is inherently reliable. One such exception is an excited utterance. An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). Hearsay is admissible under this exception if (1) a startling event occurred, (2) the declarant made the statement while under the stress or excitement of the startling

11

event, and (3) the statement relates to the event. *State v. Magers*, 164 Wn.2d 174, 187-88, 189 P.3d 126 (2008).

Kalachik contests the second element. In determining whether the second element is met, the critical question is whether the declarant was still under the influence of the startling event or condition to the extent the statement could not have been the result of fabrication, intervening actions, or the exercise of choice or judgment. *State v. Woods*, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001).

Various decisions have upheld trial court rulings where the declarant's excited statements were made hours after the startling event. *See, e.g.*, *State v. Thomas*, 150 Wn.2d 821, 853-55, 83 P.3d 970 (2004) (statement to friend by visibly shaken and fearful murder witness made 90 minutes after shooting held admissible); *State v. Guizzotti*, 60 Wn. App. 289, 296, 803 P.2d 808 (1991) (statement to 911 operator by emotional rape victim who hid seven hours from assailant held admissible); *State v. Fleming*, 27 Wn. App. 952, 956, 621 P.2d 779 (1980) (statements to friend by scared rape victim three hours after rape held admissible).

Here, S.B. said she was raped between 6 and 7 in the morning. About one hour later, she spoke with Officer Suvada and told him what had happened. Officer Suvada noticed she appeared alarmed, excited, and spoke very quickly in a disorganized fashion.

This is sufficient to sustain the trial court's ruling on this evidentiary issue.  We conclude

the trial court did not abuse its discretion when it ruled S.B.'s statements to Officer

Suvada were admissible under ER 803(a)(2) as excited utterances.

> 2.      *S.B.'s statements to Nurse Stern were not admissible under*
> *ER 803(a)(2)*

As previously mentioned, the critical question is whether the declarant was still

under the influence of the startling event or condition to the extent the statement could not

have been the result of fabrication, intervening actions, or the exercise of choice or

judgment.  *Woods*, 143 Wn.2d at 597.

Here, S.B. said she was raped between 6 a.m. and 7 a.m., and she spoke a second

time with Officer Suvada around 8:30 a.m.  The trial court properly excluded this second

discussion because S.B. had calmed down and was able to organize her thoughts.  She no

longer was under the stress of the exciting event.  Two hours later, at 10:30 a.m., Nurse

Stern interviewed S.B.  In the hours between 8:30 a.m. and 10:30 a.m., S.B. had the

opportunity to fabricate or exercise judgment.  S.B.'s statements to Nurse Stern therefore

did not qualify as excited utterances.  There is no legal authority, either cited by the State

or located by this court, which resurrects excited utterances after the declarant had calmed

down for a period of time.  The trial court erred as a matter of law in concluding

otherwise and, in doing so, abused its discretion. We conclude S.B.'s statements to Nurse

Stern were not admissible under ER 803(a)(2).

### 3.    *Legal error in applying ER 803(a)(4) to Nurse Stern*

Another exception to the hearsay rule is statements made for purposes of medical

treatment. The scope of this exception encompasses "[s]tatements made for purposes

of medical diagnosis or treatment and describing . . . [the] general character of the cause

or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

ER 803(a)(4). Hearsay is admissible under the medical treatment exception if (1) the

declarant's motive in making the statement was to promote treatment, *and* (2) the medical

professional reasonably relied on the statement for purposes of treatment. *In re Pers.*

*Restraint of Grasso*, 151 Wn.2d 1, 20, 84 P.3d 859 (2004).

Kalachik contends the trial court abused its discretion by applying the wrong legal

standard. He argues the trial court ignored the first element of the medical treatment

hearsay exception and conflated the second element of that exception with the

confrontation clause's primary purpose test. We agree.

In making its ER 803(a)(4) ruling, the trial court commented:

> The nurse here testified that the primary purpose is to provide
> prophylactic medication options at the time of the interview that would
> address potential [sexually transmitted diseases], emergency contraceptives,
> . . . and to assess other injuries[—]here, some cervical bleeding as well as

the fingernail removed, an abrasion and bruising on either of her thighs, the front of her thighs.

. . . .

And so the primary purpose . . . of her statements . . . describing the incident do[es] relate to treatment. . . . That—those statements better enable the nurse to assess whether she might benefit from some of these treatment options. And so not only does the nurse state that that's the reason and— but the questions asked and the information gathered relate to treatment. And so I think [ER] 803(a)(4) is satisfied.

RP at 184-85.

The trial court's comments conflate the standards for admitting medical treatment hearsay with the confrontation clause's primary purpose test, which we discuss later. In applying the wrong legal standard, the trial court abused its discretion.

Applying the correct legal standard, it is clear the medical treatment exception does not apply. After the alleged attack, S.B. walked to the courthouse, not a hospital. She asked for a police officer, not a doctor. Once Officer Suvada arrived at the courthouse and asked S.B. a series of questions, he asked if she was willing to participate in a "rape exam." RP at 101. She agreed. Officer Suvada then called an ambulance, S.B. got in, and the officer followed the ambulance to the hospital. Two hours passed between when S.B. arrived at the hospital and when the sexual assault exam began. During this time, S.B. did not seek any medical treatment. She became concerned that her roommates might learn she was cooperating with law enforcement and repeatedly said she wanted to

leave, but remained when Officer Suvada told her they were trying to get the nurse there from Portland as soon as possible.

The State presented no evidence that S.B. made statements to Nurse Stern to promote medical treatment. She never indicated any desire for medical treatment, either before going to the hospital or while waiting at the hospital for two hours. She went there because Officer Suvada asked if she would undergo a "rape exam," and remained there at the urging of law enforcement. Her concern at the hospital was that her roommates might find out she was cooperating with law enforcement. We conclude that S.B.'s statements to Nurse Stern were inadmissible under the medical treatment exception to hearsay and that those statements should have been excluded.

Because S.B.'s statements to Nurse Stern should have been excluded under evidentiary principles, we do not address whether those statements were also barred by the confrontation clause.

B.    SIXTH AMENDMENT RIGHT TO CONFRONT WITNESSES

Kalachik contends S.B.'s statements to Officer Suvada were barred under the confrontation clause and the trial court erred by admitting them. We review alleged confrontation clause violations de novo. *State v. Wilcoxon*, 185 Wn.2d 324, 329, 373 P.3d 224 (2016) (plurality opinion).

16

No. 37346-1-III
*State v. Kalachik*

The confrontation clause of the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." This right protects a criminal defendant from defending against testimony given out of court by witnesses who are unavailable unless the defendant had the opportunity to cross-examine the witness at another time. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *Burke*, 196 Wn.2d at 725.

Using a textual approach, *Crawford* determined that the confrontation clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" 541 U.S. at 51 (quoting 2 Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). Only testimonial statements cause the declarant to be a "witness" within the meaning of the confrontation clause. *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006); *Burke*, 196 Wn.2d at 725.

*Crawford* and *Davis* advise how to answer the threshold question of whether a statement is testimonial. "In general, where the statement is functionally trial testimony, it is testimonial; where it is just a casual statement made to a friend, it is nontestimonial." *Wilcoxon*, 185 Wn.2d at 332. *Crawford* listed examples of testimonial statements, including statements that declarants would reasonably expect to be used prosecutorially. 541 U.S. at 51. Generally, statements taken by law enforcement in the course of

17

interrogations are testimonial, whereas casual remarks to acquaintances are not. *Id.* at 51-52.

*Constitutional error with respect to Officer Suvada's testimony*

Not all statements to law enforcement are deemed testimonial. One recognized exception is statements to law enforcement officers to help resolve an ongoing emergency. *Davis*, 547 U.S. at 822; *Burke*, 196 Wn.2d at 727. Courts look at four factors when determining whether there was an ongoing emergency: (1) "the timing of the statements relative to when the described events occurred," (2) "the nature of what was asked and answered during the interrogation to determine whether the elicited statements were necessary to resolve a present emergency or merely to determine what happened in the past," (3) "the threat of harm posed by the situation as judged by a 'reasonable listener,'" and (4) "the level of formality of the interrogation." *State v. Reed*, 168 Wn. App. 553, 563-64, 278 P.3d 203 (2012).

Kalachik relies on *State v. Koslowski*, 166 Wn.2d 409, 209 P.3d 479 (2009), in contending the statements were testimonial. In *Koslowski*, a woman was assaulted by robbers and tied up. *Id.* at 414. Police officers responded to a 911 call reporting the robbery but, by the time they arrived, the attackers were gone. *Id.* They asked the victim a number of questions, including what had happened and any descriptors of the attackers,

which she answered. *Id.* The victim was unavailable at trial and the trial court allowed a police officer to relate her statements to the jury. *Id.* at 430-31.

The Washington Supreme Court reversed and held the statements were testimonial. *Id.* at 432-33. The court noted, "[I]nitial inquiries at the scene of a crime might yield nontestimonial statements when officers need to determine with whom they are dealing in order to assess the situation and the threat to the safety of the victim and themselves." *Id.* at 425-26. However, the court cited examples where the initial inquiries were very short and sought minimal detail. The *Koslowski* court distinguished its facts—where the victim had the protection of police around her, from *Davis*—where the victim was alone and reported the crime to 911. *Id.* at 426.

Officer Suvada's questioning in this case is similar to *Koslowski* where officers asked the victim for details when the attackers were no longer around. When S.B. spoke with Officer Suvada, she was far away from Kalachik and under the aegis of police protection. Objectively, there was no ongoing emergency. Officer Suvada's questions were about what had happened in the past, the name of the person who did it, and how to locate him. During this questioning, there was no threat of harm to S.B. We conclude the trial court erred when it ruled S.B.'s statements to Officer Suvada did not violate the Sixth Amendment's confrontation clause.

19

C.       CONSTITUTIONAL ERROR NOT HARMLESS BEYOND A REASONABLE DOUBT

A confrontation clause violation is presumed prejudicial unless the prosecution

proves "'beyond a reasonable doubt that the error complained of did not contribute to the

verdict obtained.'" *State v. Jasper*, 174 Wn.2d 96, 117, 271 P.3d 876 (2012) (quoting

*Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)).  The

error is harmless only where "the untainted evidence is so overwhelming that it

necessarily leads to a finding of the defendant's guilt . . . ." *Koslowski*, 166 Wn.2d at

431.

Here, without S.B.'s description of what happened through Nurse Stern and

Officer Suvada, the evidence to sustain Kalachik's conviction is limited to the courthouse

security officer's testimony that S.B. told her she was raped and kicked out of a car and to

descriptions of what witnesses observed about S.B.'s physical condition and demeanor.

But given Kalachik's testimony, the evidence to sustain his conviction is not so

overwhelming that it necessarily leads to a finding of guilt.  We conclude that the

constitutional error was not harmless beyond a reasonable doubt.

CONCLUSION

We conclude the trial court erred when it admitted S.B.'s statements to Officer

Suvada and Nurse Stern. We vacate Kalachik's conviction for first degree rape and

remand.[3]

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:


_____    _____
Siddoway, A.C.J.                             Fearing, J.

---

[3] Because we reverse on evidentiary and constitutional grounds, we need not address Kalachik's prosecutorial misconduct claim.